**In re Mollie ORSHANSKY; Jane Pollack, Appellant.**

No. 02–PR–170.

District of Columbia Court of Appeals.

Argued June 25, 2002.
Decided Aug. 15, 2002.

---

George A. Teitelbaum, Washington, DC, for appellant.

George T. Masson, Washington, DC, for appellee Harry J. Jordan.

Tanja H. Castro, with whom Thomas D. Leland was on the brief, Washington, DC, for appellee Mollie Orshansky.

Before FARRELL, RUIZ, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Jane Pollack appeals from the appointment of Harry J. Jordan as general guardian and conservator for her aunt, Mollie Orshansky. In addition to challenging the probate court's jurisdiction, Ms. Pollack principally contends that the court abused its discretion when it rejected Ms. Orshansky's own arrangements for her incapacity and, against her and her family's wishes, appointed Mr. Jordan, a District of Columbia lawyer who had no prior relationship with her. Mr. Jordan, joined by Tanja H. Castro, the attorney whom the probate court appointed to represent Ms. Orshansky, argues that Ms. Pollack has no standing to pursue this appeal. As well, both Mr. Jordan and Ms. Castro ask us to uphold the probate court's jurisdiction and affirm its rulings on the merits.

This controversy began when George Washington University Hospital petitioned the Superior Court to appoint a guardian and a conservator for Ms. Orshansky, whom the Hospital had admitted on a referral from the Adult Protection Services division of the District's Family Services Administration. Before the date of the hearing on the petition, Ms. Pollack removed Ms. Orshansky from the Hospital without its knowledge and took her to New York. Informed of this development, the court held an emergency hearing and appointed Mr. Jordan to serve as Ms. Orshansky's temporary guardian and conservator to protect her interests pending final resolution of the petition. At a subsequent hearing, after taking testimony and argument from Mr. Jordan, Ms. Pollack and

others, the court granted the petition and finalized Mr. Jordan's appointments.

The proceeding in this case, called an intervention proceeding, is governed by the District of Columbia Guardianship, Protective Proceedings, and Durable Power of Attorney Act of 1986, D.C.Code § 21–2001 *et seq.* (2001). Under the Guardianship Act, the Superior Court may, upon petition, appoint a guardian and a conservator for an "incapacitated individual," i.e., "an adult whose ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that he or she lacks the capacity to manage all or some of his or her financial resources or to meet all or some essential requirements for his or her physical health, safety, habilitation, or therapeutic needs without court-ordered assistance or the appointment of a guardian or conservator." D.C.Code § 21–2011(11). The appointment of a guardian and a conservator is an extraordinary intervention in a person's life and affairs, and the Act lays out standards and procedures that are designed to ensure careful consideration and respect for the rights of the subject of the proceeding. The ultimate decision is committed to the informed discretion of the probate court judge.

We hold that Ms. Pollack has standing to appeal the decision of the probate court and that the probate court had jurisdiction to entertain the intervention petition. On the merits, we reverse. We hold that the probate court abused its discretion and violated statutory requirements for the appointment of a guardian and a conservator by not taking proper account of Ms. Orshansky's own plans and wishes and by making the appointments without sufficient information regarding Ms. Orshansky's needs and best interests or other sufficient factual foundation.

In order that our holdings may be understood, we summarize the facts and proceedings below in greater detail than usual for an appellate opinion.

## I. FACTUAL BACKGROUND AND PROCEEDINGS BELOW

### A. The Decision to Hospitalize Mollie Orshansky

Mollie Orshansky is eighty-seven years old. She lived by herself in the District of Columbia for forty years. She has no family in the District; her closest relatives are her two sisters and her nieces and nephews, all of whom live in the New York City area. Ms. Orshansky came to the attention of Adult Protection Services (APS) in early November 2001, when the property manager of the building in which she resided reported finding her in need of assistance. Over the next few weeks, Dr. Deborah Meyers, an APS social worker, paid several visits to Ms. Orshansky. On each visit, Ms. Orshansky came to the door dressed in the same soiled and dirty pajamas. Dr. Meyers saw that Ms. Orshansky was malnourished, frail, and in "a self-neglecting state." Her hygiene was poor and her apartment was unsanitary. During another visit, on December 11, Dr. Meyers found Ms. Orshansky outside in the cold, still dressed in her pajamas, and unable to find her apartment. Dr. Meyers tried to arrange for Ms. Orshansky to see her doctor and accept a home care aide, but she refused to cooperate.

When Dr. Meyers visited Ms. Orshansky again on December 19, she discovered her lying helpless on the floor of her apartment. Ms. Orshansky was malnourished, dehydrated and filthy. APS transported her to George Washington University Hospital, where she was admitted. Two days later, on December 21, the Hospital filed a petition in the Probate Division of Superior Court for the appointment of a permanent general guardian and a conservator. The Hospital supported its petition with an

examiner's report signed by Dr. Katherine Goodrich, a hospital physician who is Board-certified in internal medicine. In her report, Dr. Goodrich stated that she examined Ms. Orshansky on December 20 and diagnosed her as suffering from a progressive global dementia. Dr. Goodrich stated that as a result of her dementia, Ms. Orshansky is "unable to care for herself," "unable to make sound judgments [about] her medical or physical care," and "unable to do her activities of daily living." The report contains no other detail about Ms. Orshansky's condition, degree of impairment, prognosis or treatment needs, but it recommends a nursing home as the most appropriate living arrangement for her. So far as appears from the record, Dr. Goodrich, who is apparently neither a gerontologist nor a psychiatrist, is the only doctor who has examined Ms. Orshansky and found her to be incapacitated.[1]

Upon receiving the Hospital's petition, the probate court scheduled an initial hearing for February 12, 2002, and appointed Harry Jordan, an attorney on the court's fiduciary list, to represent Ms. Orshansky. Formal notice of the petition and the hearing was given to Ms. Orshansky and to members of her family in New York City.

## B. Removal of Mollie Orshansky from the Hospital

On January 2, 2002, Ms. Orshansky's niece, Jane Pollack, and her nephew-in-law, Eugene Shapiro, met in Washington with Dr. Meyers and representatives of the Hospital to ask that their aunt be released into their care. They presented a "health care proxy"[2] that Ms. Orshansky

had executed some eighteen months earlier, in July 2000. In the proxy, Ms. Orshansky appointed Ms. Pollack to be "my health care agent to make any and all health care decisions for me, except to the extent that I state otherwise." The proxy stated that it "shall be in effect when and if I become unable to make my own health care decisions," and "shall remain in effect indefinitely" unless Ms. Orshansky revoked it. Despite the presentation of this proxy, APS opposed Ms. Orshansky's release, and the Hospital refused to discharge her while its petition for the appointment of a guardian and a conservator was pending.

Unable to obtain her aunt's release, Ms. Pollack extended her stay in Washington. Over the next few weeks, she lodged numerous complaints with the Hospital that her aunt was not receiving adequate care, therapy or stimulation. As a result, Ms. Pollack charged, her aunt was suffering bruises, sores and urinary tract infections, and was growing weaker and more confused every day she remained in the Hospital.

On January 21, frustrated by what she perceived as the Hospital's indifference to her complaints, Ms. Pollack decided that, as her aunt's health care agent, she had to take matters into her own hands. Without telling the Hospital of her intentions, Ms. Pollack removed Ms. Orshansky and took her to New York City. From there, she called the Hospital to report what she had done.

1. Mr. Jordan and Ms. Castro agree that no other doctor evaluated Ms. Orshansky at the Hospital. In her brief on appeal, Ms. Pollack states without record citation or support that a psychiatrist concurred in Dr. Goodrich's assessment. This apparent factual dispute did not arise and was not resolved in the probate court proceedings below.

2. A health care proxy is a document authorized by New York law in which a competent adult delegates the authority to make health care decisions in the event of incapacity. *See* N.Y. Pub. Health Law §§ 2980(8), 2981 (McKinney 2002).

## C. The Emergency Hearing

Upon learning that Ms. Pollack had removed Ms. Orshansky without its authorization, the Hospital notified APS, the police and Mr. Jordan. It then filed an amended petition, informing the probate court that Ms. Orshansky "is incapacitated and was fraudulently removed from [the Hospital] by her relatives and moved to New York State." The amended petition requested the immediate appointment of a temporary guardian and conservator to protect Ms. Orshansky and her assets.

On January 25, Judge Christian held an emergency hearing on the amended petition. In attendance were representatives of the Hospital, Mr. Jordan on behalf of Ms. Orshansky, Dr. Meyers of APS, and George Teitelbaum, an attorney who appeared on behalf of Ms. Pollack. Dr. Meyers testified regarding APS's involvement with Ms. Orshansky, the January 2 meeting with Ms. Pollack and Mr. Shapiro, and the events leading up to the emergency hearing. Dr. Meyers stated that Eugene Shapiro was present when she made her first visit to Ms. Orshansky's apartment in November, and Ms. Orshansky "lashed out at him verbally" at the time and adamantly wanted him to leave. Dr. Meyers also testified that APS had told the family that it was investigating "everything that is connected with Ms. Orshansky," and had asked for financial information which the family refused to supply. Dr. Meyers asked the court to intervene because "APS is not satisfied with the actions of the family, and [does] not believe that Ms. Orshansky is in the safest care at this time."

Mr. Jordan supported the Hospital's emergency petition and volunteered to serve in the role of temporary guardian and conservator. He reported that he had visited Ms. Orshansky when she was still at the Hospital and found her to be confused, disoriented and unable to take care of herself, but content, not agitated, and "physically okay." He "saw nothing to suggest that she wasn't getting the best of medical attention." When Mr. Jordan learned that Ms. Orshansky had been removed, he telephoned her niece, Eda Shapiro (Eugene Shapiro's wife). According to Mr. Jordan, Ms. Shapiro was hostile to his inquiries and refused to answer his questions. She insisted that the family was following the instructions of their attorney in New York and acting in accordance with law.

Mr. Jordan also reported that he had learned from APS that Ms. Orshansky had significant assets, which included co-op apartments in the District and New York, a government pension, and an account in the District with Merrill Lynch. He said that a Merrill Lynch customer representative had informed him that the account held nearly a million dollars, and that Eugene Shapiro had contacted Merrill Lynch to request that the account be transferred to New York. Merrill Lynch had declined to accede to that request and had frozen the account. Mr. Jordan expressed his concern that Ms. Orshansky would not be safe in New York because "she wasn't taken care of down here even though the family acknowledged what was going on." "Hate to say this," he added, "but I think there's a lot of money involved here and that might be a driving force."

Speaking for Ms. Pollack, Mr. Teitelbaum moved to dismiss the amended petition on the grounds that Ms. Orshansky had not been given notice of the emergency hearing and that the court lacked jurisdiction because Ms. Orshansky "no longer" was domiciled in the District of Columbia. Regarding the merits, Mr. Teitelbaum argued that no guardian or conservator was needed because there existed what he called "a valid power of attorney," i.e., the health care proxy, a copy of which he

furnished to the court for its examination. Mr. Teitelbaum argued that the proxy authorized Ms. Pollack to remove Ms. Orshansky from the Hospital, and that she did so because her aunt was suffering and had no medical problems requiring her to remain there. Mr. Teitelbaum agreed that Ms. Orshansky was "incompetent" but argued that when she was lucid she had made arrangements to be cared for by her relatives in New York if she were to become incapacitated.

Rejecting the jurisdictional and notice objections to the proceeding,[3] Judge Christian granted the Hospital's amended petition for the temporary appointment of a guardian and conservator. Finding that Ms. Orshansky was an incapacitated individual who was unable to manage her affairs or care for herself, the judge further found that she had been "improperly removed" from the Hospital and transported to New York while the original petition was pending. Judge Christian did not explain why she found that Ms. Orshansky's removal from the Hospital was "improper." The petitioners presented no evidence that the health care proxy was invalid or inoperative, that Ms. Pollack had removed Ms. Orshansky against her will, or that Ms. Orshansky's removal threatened her health or violated any law. Nor did the judge make findings to that effect.

After making her findings, Judge Christian accepted Mr. Jordan's offer to serve as temporary guardian and conservator for Ms. Orshansky and appointed Tanja Castro, another attorney on the court's fiduciary list, to replace him as her attorney. Declaring that "all Powers of Attorney heretofore signed by Mollie Orshansky for any purpose, including healthcare, are hereby voided," Judge Christian directed Mr. Jordan to go to New York and "determine and provide for Ms. Orshansky's best interests, care, and placement." Judge Christian did not explain the legal grounds on which she voided the health care proxy and any other powers of attorney that may have existed. The judge further instructed Mr. Jordan to return Ms. Orshansky to the District of Columbia and George Washington University Hospital if he deemed it appropriate to do so. Judge Christian also directed Mr. Jordan to take "immediate control" over Ms. Orshansky's assets and ordered her accounts frozen until he succeeded in doing so.

Three days later, on January 28, Ms. Pollack petitioned the New York Supreme Court to appoint *her* to be Ms. Orshansky's guardian and conservator. The New York court ordered all concerned parties, including Mr. Jordan, to show cause why the petition should not be granted, and scheduled the matter for a hearing in March. In the interim, the court prohibited the removal of Ms. Orshansky from New York City.

### D. The Hearing on the Petition

On February 12, 2002, as originally scheduled, the hearing on George Washington University Hospital's petition for the appointment of a permanent general guardian and conservator for Ms. Orshansky commenced before Judge Christian. Ms. Castro appeared for Ms. Orshansky and, without objection, waived her presence. The judge confirmed that all present, including Ms. Castro, agreed that Ms. Orshansky was incapacitated within the meaning of the statute authorizing ap-

---

3. Judge Christian ruled that Ms. Pollack could not "thwart" the court's jurisdiction, which was based on Ms. Orshansky's domicile in the District of Columbia, by removing her to New York after the petition was filed. The judge also decided that she had the authority to issue temporary rulings to protect Ms. Orshansky's assets and personal welfare even though Ms. Orshansky had not received notice of the emergency hearing.

pointment of a permanent guardian and conservator. Ms. Pollack, who appeared at the hearing with her counsel, Mr. Teitelbaum, renewed her jurisdictional challenge, which the judge again rejected.

With these preliminaries out of the way, the hearing focused on two interrelated questions: whether Ms. Orshansky needed to be returned to the District of Columbia, and whether the court should select Mr. Jordan or Ms. Pollack as her permanent guardian and conservator. Mr. Jordan, the Hospital, Ms. Castro, and Dr. Meyers of APS all called for Ms. Orshansky's return to the District and the selection of Mr. Jordan. Ms. Pollack opposed those recommendations. Four witnesses testified: Mr. Jordan, Dr. Meyers, a Washington neighbor of Ms. Orshansky named Sheila Muldihill, and Ms. Pollack. Mr. Teitelbaum advised the court that a fifth intended witness, Ms. Orshansky's sister, Rose Orshansky, was unable to appear for health reasons. He asked that the hearing not be concluded until Rose Orshansky could testify. The judge denied that request, but stated that Mr. Teitelbaum could file a motion for reconsideration or an appeal if he saw fit to do so. Mr. Teitelbaum also sought to introduce affidavits from other relatives of Ms. Orshansky, but Judge Christian excluded these affidavits on hearsay grounds.

### 1. Harry Jordan

In his testimony, Mr. Jordan reported that he visited Ms. Orshansky in her New York apartment on February 1. He found Ms. Orshansky in a wheelchair, clean and with her hair brushed, and "very calm" though physically frail. When Mr. Jordan spoke with her, Ms. Orshansky was "very confused" and thought she was still in Washington, D.C. She did not understand who he was or what was going on. Ms. Orshansky was attended by a woman whom the family had retained as a full-time, live-in aide. Mr. Jordan was in-

formed that this woman was not a nurse or dietitian but had prior experience living with and caring for another elderly woman. Mr. Jordan inspected the apartment and found it to be furnished "rather sparsely" with a sofa, a few chairs, two day beds, "and what have you." Mr. Jordan also "glanced" in the refrigerator and saw that there was food. In the course of his visit, he spoke at great length with Ms. Pollack. She explained to him that she had brought Ms. Orshansky to New York because she was unhappy with the care her aunt was receiving in the Hospital. She was taking Ms. Orshansky to doctors in New York for an ulcer on her foot, an eye problem and other reasons, and she believed that her aunt now was receiving the care she needed. Mr. Jordan voiced a concern that Ms. Orshansky did not have a full-sized bed with rails to prevent her from falling, and Ms. Pollack told him that a hospital bed was being purchased. She also told Mr. Jordan that family members had been visiting with Ms. Orshansky now that she was in New York. Mr. Jordan did not see any other relatives of Ms. Orshansky during his visit.

Based on these observations, Mr. Jordan expressed the opinion that Ms. Orshansky was "not getting the care that she deserves, simply given the fact that the lady has the wherewithal to be given anything she wanted." And, he stated, "I don't think it's going to get any better. I think it's going to get worse." Mr. Jordan did not explain this prediction. He discounted "the fact that relatives might have good intentions, would like to come by and see her," because "I think in the long run it's not the best thing for Mollie Orshansky." Mr. Jordan expressed concern that the live-in aide hired by the family lacked the medical skills he thought necessary to respond to an emergency such as a heart

attack or an asthma attack.[4] He believed that Ms. Orshansky needed professional medical care "around the clock." Instead of being taken to see doctors, he thought that "what she really needs is to be in a facility where the doctors are there where they can come to her." Mr. Jordan opined that Ms. Orshansky should be returned to Washington and either "put back" in her "well furnished" apartment, where health-care professionals could attend to her, or else put in a nursing home. Because Jane Pollack was responsible for Ms. Orshansky's removal to New York, he did not consider her to be a "proper candidate" for the positions of guardian or conservator.

Conceding that he was "not a medical expert by any stretch of the imagination," Mr. Jordan did not explain his qualifications for offering his opinions about Ms. Orshansky's medical needs. No medical or other expert evaluation of Ms. Orshansky's needs or appropriate placement was offered in evidence at the hearing.

On the question of the need for a conservator, Mr. Jordan testified that he had determined that the bulk of Ms. Orshansky's assets, including her account at Merrill Lynch, were held in a revocable trust of which she was the sole beneficiary.[5] Ms. Orshansky had created the trust in 1981. She and her sister, Rose Orshansky, were the co-trustees and each had authority to write checks on the Merrill Lynch account. Mr. Jordan learned that Merrill Lynch had lifted its freeze on the account, apparently at the behest of counsel for Rose Orshansky or Jane Pollack. Mr. Jordan had not discussed the account with Rose Orshansky, but Merrill Lynch had advised him that no extraordinary checks had been written on it. He acknowledged that he had no reason to think that Rose Orshansky was misappropriating or mismanaging trust funds. Nonetheless, Mr. Jordan recommended appointment of a conservator to prevent the improper diversion of Ms. Orshansky's assets. His principal concern was that Ms. Pollack had told him that approximately $90,000 in the Merrill Lynch account belonged to Rose Orshansky as her share of the proceeds from the sale of jointly owned property. Mr. Jordan also noted that Rose Orshansky and numerous other relatives were residual beneficiaries of the trust. More generally, Mr. Jordan expressed the view that "this is one of these unfortunate situations where you have somebody who has plenty of money and obviously it can be some temptations at time [sic]."

## 2. Dr. Deborah Meyers

In her testimony, Dr. Meyers reviewed once again the events that led up to Ms. Orshansky's hospitalization. Dr. Meyers said that Ms. Orshansky told her during one of her home visits that she wanted to stay in Washington, D.C., and did not want to go to New York. Dr. Meyers also stated that "APS feels that the family does not have the best interests" of Ms. Orshansky at heart. The reason Dr. Meyers gave for this conclusion was that the family did not cooperate with APS's requests for financial information. Dr. Meyers also "questioned" why Eugene Shapiro had allowed Ms. Orshansky to sink into the condition in which APS found her. However, Dr. Mey-

---

**4.** Mr. Jordan admitted that Ms. Orshansky's medical records, which he had reviewed, did not suggest that she was in danger of either a heart attack or an asthma attack. When asked for the "medical basis" of his opinion, he explained that "I have an aunt who went through the same thing and then she died of a heart attack in similar circumstances."

**5.** In addition to the Merrill Lynch account, Mr. Jordan was aware that Ms. Orshansky received a pension of over $7,000 a month and owned her apartment in Washington. He did not know if she also owned the apartment in New York.

ers described how suspicious Ms. Orshansky was of Mr. Shapiro when she saw them together on November 19, and acknowledged that Ms. Orshansky stymied APS as well when it tried to help her because of her reluctance to admit that she needed assistance. Although Ms. Orshansky at one point agreed to see her regular physician and two home care service agencies, she refused to follow through with the appointments. Dr. Meyers told Ms. Orshansky's relatives about the appointments when she set them up, but never informed the family that the appointments were not kept. Dr. Meyers did not so inform the family, she said, because she was waiting for Eda Shapiro to fax her Ms. Orshansky's financial information first.

### 3. Sheila Muldihill

Ms. Castro called Sheila Muldihill, a long-time friend and neighbor of Ms. Orshansky in Washington, to testify. Before Ms. Orshansky was hospitalized, Ms. Muldihill kept in touch with her by telephone. She said she last visited Ms. Orshansky in her apartment "a year ago and took out a number of newspapers, but then I had pushed her as far as she could be pushed, and no more." Ms. Muldihill mentioned her efforts to get Ms. Orshansky to see a doctor, and Ms. Orshansky's expressed desire to go to New York:

> I tried to get her to go to the doctor. Well, the doctor had moved. And then she wanted to go to New York, but she couldn't go to New York until she'd gone to the doctor, and blah, blah, blah. So, we discussed this, or she told it to me regularly.

Ms. Muldihill reported that many of the residents of their apartment building had asked about Ms. Orshansky and "really cared about her."

### 4. Jane Pollack

Finally, Jane Pollack testified. She described at some length a close and long-standing relationship that she and members of her family in New York had with Ms. Orshansky, how they had been visiting her regularly and looking after her, and how they had been unable to convince her to accept help as her ability to care for herself was declining. When Dr. Meyers notified the family of the extreme situation in which she found Ms. Orshansky, the family was prepared to take further steps. It held off doing so, Ms. Pollack testified, because Dr. Meyers reported that she was visiting Ms. Orshansky and had succeeded in persuading her to accept a home care worker. Ms. Pollack said that she relied on this report after confirming it directly with her aunt. The next thing the family heard, Ms. Orshansky was in the hospital.

Ms. Pollack described why and how she removed Ms. Orshansky from the Hospital relying on her authority as Ms. Orshansky's health care agent under the health care proxy.[6] She testified that she brought her aunt to the apartment that Ms. Orshansky owned in the same building in which her sister, Rose Orshansky, resided so that Ms. Orshansky's family would be able to visit with her and care for her "both physically and emotionally." According to Ms. Pollack, her aunt had purchased this apartment in 1987 "so that she

**6.** Ms. Castro successfully objected to the admission of the health care proxy in evidence on the ground that neither Ms. Orshansky nor the witnesses who signed the document were present in court to authenticate it. For several reasons, we nonetheless have considered ourselves at liberty to quote from the proxy: Judge Christian examined and voided the proxy at the emergency hearing on January 25; there is no dispute about its existence, contents, or, given Ms. Pollack's testimony, the fact that Ms. Orshansky did sign it; Ms. Castro conceded the "validity" of the proxy on appeal at oral argument; and Mr. Jordan did not join in Ms. Castro's objection to its admission in evidence at the hearing.

would have it in [the] circumstances that she's in now," and had stayed in it regularly during her frequent visits to the city. After bringing Ms. Orshansky to New York, Ms. Pollack hired an aide who had thirteen years of experience caring for elderly people to live with her aunt and look after her. Ms. Pollack had been monitoring her aunt's care "very closely," and saw that the aide "is very dedicated and ... takes good care" of her.[7] Ms. Pollack also took Ms. Orshansky to see Rose Orshansky's doctor, who examined her and found that she did not need to remain hospitalized.[8] The doctor discussed Ms. Orshansky's diet and nutritional needs and the best course of therapy for her. Ms. Pollack understood that Ms. Orshansky would benefit from physical therapy, and said that the family was in the process of deciding where it would be furnished. Ms. Pollack believed that her aunt was in much better shape, mentally and physically, than she had been in at the Hospital. Having researched nursing facilities in the New York area, Ms. Pollack also believed that her aunt was far better off in her own apartment than she would be in a nursing home.[9]

Ms. Pollack confirmed that her aunt's pension checks were being deposited in the Merrill Lynch account which was held in the revocable trust that Ms. Orshansky had established. Ms. Pollack testified that Rose Orshansky, as co-trustee and co-signatory on the Merrill Lynch account, began paying all her sister's bills for her about two years ago, when she discovered that Ms. Orshansky was neglecting her financial affairs. Contrary to the testimony of Mr. Jordan, Ms. Pollack said that she did not know of sale proceeds or any other funds in the Merrill Lynch account that did not belong to Mollie Orshansky. Ms. Pollack testified that while she had little knowledge regarding the trust, she understood simply that Rose Orshansky had lent her sister money in 1987 to help her buy the New York apartment in which she now was living.

Ms. Pollack testified that while Ms. Orshansky was not able to take care of herself, she knew about the petition in the District to appoint her a guardian and conservator and emphatically opposed it. This testimony came out after the Hospital's counsel informed the court during a break that Mr. Teitelbaum had delivered to him and Ms. Castro a typewritten statement signed by Ms. Orshansky and two witnesses in which she purportedly stated her views. Questioning the propriety of securing the statement from Ms. Orshansky without the knowledge of Mr. Jordan or Ms. Castro, Judge Christian asked for an explanation. Mr. Teitelbaum responded that "her lawyer has never spoken to Mollie Orshansky"—a startling piece of news the significance of which all concerned overlooked at the time.[10] Ms. Pollack then resumed the stand and testified that it was she who typed the statement after Rose Orshansky brought it to her in handwritten form and told her that her sister had made it. Ms. Pollack also testified that she herself had read the Hospi-

---

7. Ms. Pollack testified that the aide gave Ms. Orshansky her blood pressure medication, which she took in pill form. Ms. Pollack did not know whether the aide was certified to administer medication. She also did not know whether the aide took Ms. Orshansky's temperature and blood pressure on a regular basis.

8. Ms. Pollack acknowledged that she did not furnish the doctor with Ms. Orshansky's med-

ical records from George Washington University Hospital.

9. Although Mr. Jordan had testified that Ms. Pollack said she was purchasing a hospital bed, Ms. Pollack testified that she purchased bed rails.

10. Ms. Castro did not dispute the assertion that she had not talked to her client.

tal's petitions to Mollie Orshansky and tried to explain them to her; that her aunt was "very agitated" about the proceedings; that she was "absolutely" capable of saying what appeared in the statement; that "I have personally heard her say the things that are in there;" and that "she has said every single one of those things."

Mr. Jordan opined that, based on his interviews with Ms. Orshansky, she could not possibly have made the statement attributed to her or even understood it. Ms. Castro opposed admission of the statement on hearsay grounds. But if Ms. Pollack's testimony is to be believed, Ms. Orshansky has expressed the strong desire to continue living in her New York apartment near her sister and other relatives, and is dismayed by the prospect of being put in a nursing home. She does not want the court in the District of Columbia to supersede the trust and health care arrangements that she made and to appoint her a guardian or a conservator, and is unhappy and angry about strangers purporting to represent her against her own wishes. We discuss the significance of Ms. Pollack's testimony concerning the wishes of Ms. Orshansky in Part II.C.2.b(iii), *infra.*

### E. The Ruling on the Petition

At the conclusion of Ms. Pollack's testimony, Mr. Teitelbaum again asked for a continuance to enable Rose Orshansky to testify, specifically with regard to the issue of a conservatorship. Judge Christian denied the request and, after hearing brief argument, ruled from the bench. The following day, the judge issued written findings of fact, conclusions of law, and orders.

As one of several preliminary matters, Judge Christian stated that she had granted Ms. Pollack and her counsel permission to participate in the proceeding after determining that the best interests of Ms. Orshansky would be served thereby. In addition, the judge reiterated her ruling

that the Superior Court had jurisdiction over the petition because Ms. Pollack's removal of her aunt to New York did not change the fact that Ms. Orshansky was domiciled in the District of Columbia.

Turning to the predicates for appointing a permanent guardian and a permanent conservator, the judge found that Ms. Orshansky was incapacitated within the meaning of the guardianship statute and unable to care for herself or her property. The judge also found that Ms. Orshansky "has property that will be wasted or dissipated unless property management is provided, and money is needed for the support, care and welfare of the said individual and protection is necessary or desirable to obtain and provide money."

On the question of whom to appoint as guardian and conservator, Judge Christian stated that she credited the testimony of Mr. Jordan and Dr. Meyers, but found Ms. Pollack's testimony "inconsistent and troubling in many respects." Although she "[did] not doubt that the family loves [Ms. Orshansky]," the judge questioned "the family's actions and efforts to seek appropriate care and supervision" for her. The judge found it "troubling" that Ms. Pollack and other relatives knew that Ms. Orshansky was having problems in the summer of 2000, "yet did little to obtain care or supervision for her." The judge also was "troubled" that the family would rely on APS to take care of Ms. Orshansky in late 2001 "without checking on her status"—in contrast to "Ms. Pollack's thorough follow up on" Ms. Orshansky's care at the Hospital. Further, the judge found it "troubling" that Ms. Pollack "did not investigate returning [Ms. Orshansky] to her cooperative apartment in the District of Columbia and establishing appropriate care for her in her home."

Addressing the care that Ms. Pollack and the family provided to Ms. Orshansky after bringing her to New York, the judge noted with disapproval that the aide hired to attend Ms. Orshansky "is apparently not certified to administer medications, despite the fact that [Ms. Orshansky] takes at least one medication," and "does not take [Ms. Orshansky's] vital [signs] regularly, despite the fact that she has a history of infection which is detected by an increased body temperature." Moreover, the judge observed, when Mr. Jordan visited Ms. Orshansky in New York, he found her "sleeping in a portable bed, without bed rails." The judge also faulted Ms. Pollack for not asking the aide "how she would respond in an emergency," for "not provid[ing] the physician in New York City with [Ms. Orshansky's] prior medical records," and for "fail[ing] to have a physical therapist, an occupational therapist or dietician" see her aunt.

Finally, Judge Christian addressed Rose Orshansky's role as co-trustee of Mollie Orshansky's trust. The judge found that "Rose Orshansky has a conflict with [Mollie Orshansky]," because she lent funds to Ms. Orshansky that "remain in the trust account" and also was a residual beneficiary of the trust.

In view of these findings and conclusions, Judge Christian appointed Mr. Jordan to be the general guardian and general conservator of Ms. Orshansky. The judge directed Mr. Jordan to return Ms. Orshansky to Washington, D.C., provide her with twenty-four hour care in her home, if feasible, and serve as co-trustee of Ms. Orshansky's trust in her stead. The judge ordered Ms. Pollack and other family members not to interfere with Mr. Jor-

dan in the exercise of his fiduciary duties as conservator, and to turn over any financial documents relating to Ms. Orshansky "forthwith."

### F. Post Hearing Status Conference

On February 21, Judge Christian convened a status conference, primarily to ascertain the posture of the guardianship proceeding in New York Supreme Court. Judge Christian advised the parties that she had faxed her orders to the New York court. Counsel reported that a hearing in New York was scheduled for February 25 and the New York court had directed the parties to state why the proceeding should not be dismissed in light of Judge Christian's final order. The judge directed Mr. Jordan, Dr. Meyers, and counsel from Ms. Castro's New York office to attend the February 25 hearing if the case was not dismissed before then.[11]

Mr. Teitelbaum informed Judge Christian that he had filed a notice of appeal from her decision, and orally moved for a stay pending appeal. In connection with his stay motion, Mr. Teitelbaum reminded the court that the hearing on the petition had gone forward even though the attorney appointed to represent Ms. Orshansky, Ms. Castro, never interviewed her client. Ms. Castro, who was present at the hearing, did not dispute this allegation.

In light of her concerns about Ms. Orshansky's welfare, Judge Christian declined to stay her order pending appeal.[12] The matter of Ms. Castro's failure to interview Ms. Orshansky before the hearing on the guardianship and conservatorship petition was not pursued further.

11. Counsel have advised this court that the New York court stayed its proceeding pending the outcome of this appeal.

12. After oral argument, this court sua sponte stayed the parts of the order requiring that Ms. Orshansky be returned to the District and furnished with round-the-clock care in her home here.

## II. DISCUSSION

### A. Ms. Pollack's Standing to Appeal

Appellees contend that Jane Pollack has no standing to maintain this appeal because she was not officially a party to the proceeding in the probate court. Judge Christian, the argument goes, merely determined that it was in Ms. Orshansky's best interest to grant Ms. Pollack "permission to participate" in the proceeding, as allowed by D.C.Code §§ 21–2041(i) and 21–2054(f) and Superior Court Probate Rule 303. While Super. Ct. Prob. R. 303(c) provides that "the Court may confer the status of party on any participant it deems appropriate," Ms. Pollack did not seek "party" designation and Judge Christian did not confer it upon her.

■ The general rule that one must have been a party to the trial court proceeding in order to appeal the trial court's ruling is subject to a number of well-recognized exceptions. One such exception is that "[a]ppeals by those who participated as if parties are frequently entertained despite a failure to achieve formal status as a party." 15A Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 3902.1 (2d ed.1992). "Most of these appeals involve persons who participate in trial court proceedings as if they had intervened, and who seem to have been treated on all sides as de facto parties." *Id.* (citations omitted). *See, e.g., SEC v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 329–330 (5th Cir.2001) (applying a three-part test to decide whether a non-party may appeal, and inquiring whether (1) the non-party actually participated in the proceedings, (2) the equities weigh in favor of hearing the appeal, and (3) the non-party has a personal stake in the outcome). *Cf. Devlin v. Scardelletti,* —— U.S. ——, ——, 122 S.Ct. 2005, 2013, 153 L.Ed.2d 27 (2002) (holding that nonnamed class members who are bound by class action settlement to which they objected at the fairness hearing may appeal the approval of the settlement even though they did not intervene and become named parties).

■ If Ms. Pollack was not a party to the intervention proceeding in name, she was a party by any other measure. Through her counsel, Ms. Pollack made motions and arguments, presented evidence and cross-examined the other witnesses, all without objection. The court directed its orders at Ms. Pollack by name and informed Ms. Pollack that she could appeal. By virtue of her relationship to Ms. Orshansky, not to mention being subject to the court's decrees, Ms. Pollack had a personal stake in the outcome of the proceeding. *Cf. In re Phy. W.,* 722 A.2d 1263, 1264 (D.C.1998) (holding that foster parent has standing as a "party aggrieved" to appeal from order granting natural parent's motion for reunification). Given that stake, and because appellees and the probate court treated Ms. Pollack as a de facto party and no party is unfairly prejudiced by treating her as one for purposes of appeal, we hold that Ms. Pollack has standing to appeal.

### B. The Probate Court's Jurisdiction

Ms. Pollack contends that the probate court did not have the requisite personal jurisdiction over Ms. Orshansky to appoint a guardian or conservator for her. Although the question of personal jurisdiction is one which neither Ms. Orshansky's appointed counsel nor Mr. Jordan raised on her behalf, we assume that Ms. Pollack, as a putative alternative guardian and conservator, has standing to challenge it. To sustain the probate court's jurisdiction, appellees rely on D.C.Code § 21–2021(1) and (4). Subsection (1), on which the probate court specifically relied, provides that the Guardianship Act applies to "[a]ffairs and estates of a disappeared individual who is

domiciled in the District and an individual to be protected who is domiciled in the District." Contrary to a suggestion by Ms. Pollack, this provision authorizes an intervention proceeding where the subject is *either* "a disappeared individual who is domiciled in the District" *or* "an individual to be protected who is domiciled in the District." Appellees argue that Ms. Orshansky was in the latter category. In addition, subsection (4) provides that the Act also applies to "[a]n incapacitated individual in the District," which appellees argue Ms. Orshansky was before Ms. Pollack removed her to New York.

■■■ Ms. Orshansky was unquestionably a domiciliary of the District of Columbia—and, of course, was physically in the District—at the time she was hospitalized and the petition in this case filed and served on her. She had resided in the District for some forty years without interruption, she owned her apartment here, and while she also owned an apartment in New York City, she had not moved there. "Residence in fact is an essential element of domicile," *District of Columbia v. Woods,* 465 A.2d 385, 387 (D.C.1983) (citations omitted), and "the place where a [person] lives is properly taken to be [her] domicile until facts adduced establish the contrary." *In re Estate of Derricotte,* 744 A.2d 535, 538 (D.C.2000) (quoting *District of Columbia v. Murphy,* 314 U.S. 441, 455, 62 S.Ct. 303, 86 L.Ed. 329 (1941)). Thus, when the petition was filed, the probate court had jurisdiction pursuant to both subsections (1) and (4) of D.C.Code § 21–2021.

■■■ The probate court did not lose jurisdiction under these subsections merely because Ms. Pollack moved her aunt to New York before the hearing. In the first place, the court readily could find as it did that Ms. Orshansky's domicile remained in the District. "Domicile, once established, is presumed to continue until it is shown to have been changed." *Derricotte,* 744 A.2d at 538 (citation omitted). Physical presence in a new location "does not defeat the presumption of continuing domicile unless an intent 'to abandon a former domicile' in favor of a new one is also proven." *Id.* (quoting *Woods,* 465 A.2d at 387). It is plain that Ms. Pollack did not carry her burden of proving that Ms. Orshansky intended to forsake the District of Columbia and resettle in New York. Ms. Pollack presented some evidence that her aunt had made contingency plans for moving to New York to reside near her family if she became unable to take care of herself in Washington, but none that her aunt made the decision to act on those plans and stay in New York. To the contrary, the judge credited Mr. Jordan's testimony that Ms. Orshansky believed herself still to be in Washington, D.C.

We are not persuaded by Ms. Pollack's argument that she was authorized as Ms. Orshansky's designated health care agent to change her domicile when she became incapacitated. Assuming that the health care proxy was valid and had taken effect, it merely authorized Ms. Pollack to make health care decisions for her aunt. It did not purport to make Ms. Pollack her aunt's guardian for other purposes or empower her to change her aunt's domicile. *Cf.* D.C.Code § 21–2047(b)(2) (stating that a court-appointed guardian may "[t]ake custody of the person of the ward and establish the ward's place of abode within or without the District, if consistent with the terms of any order by a court of competent jurisdiction relating to detention or commitment of the ward"); *Lehmer v. Hardy,* 54 App. D.C. 51, 54, 294 F. 407, 410 (1923) (stating that the guardian of a minor child has "the right to change or fix her residence and domicile").

■■■ In personam jurisdiction generally is determined as of the commencement of

an action, and we see no reason to make an exception to that general rule for proceedings under the Guardianship Act, which states that general principles of law and equity are applicable unless "displaced by ... particular provisions" in the statute. D.C.Code § 21–2002(a). The Act is to be "liberally construed and applied to promote its underlying purposes and policies," which, broadly speaking, are to meet the needs of incapacitated persons for guardianship and other protection. D.C.Code § 21–2001(a). It would not help meet those needs to construe the Act so narrowly as to deprive the court of its power to intervene on an incapacitated person's behalf if that person happens to leave the District after a proceeding has been commenced. Still less would it promote the purposes and policies of the Act to construe it to permit a third party to terminate the court's jurisdiction over an incapacitated person unilaterally, by the simple expedient of removing that person from the District before the hearing on the petition can be held. We reject such a construction.

As Ms. Orshansky was in the District and domiciled here when the Hospital filed its petition and served it on her, we conclude that the Superior Court had jurisdiction to proceed with the hearing on the petition notwithstanding her subsequent departure for New York.

### C. Appointment of a Guardian and Conservator

#### 1. Standard of Review

■ The Guardianship Act provides that the court in an intervention proceeding "may" appoint a guardian for an incapacitated individual if it is "satisfied" that the appointment is necessary to provide continuing care and supervision. D.C.Code § 21–2044(b). The Act likewise provides that the court "may" appoint a conservator if it "determines" that the appointment is necessary for the support of an incapacitated individual or to protect the property of such a person. D.C.Code § 21–2051(a), (b). In each instance, the appointment decision is committed to the court's "considerable discretion," and we review it on appeal only for abuse of that discretion. *In re Langon*, 663 A.2d 1248, 1250 (D.C.1995) (holding that, where Act provides that court "may" remove a guardian or conservator, removal decisions are discretionary and reviewable only for abuse).

■ Appellate review of a discretionary decision is "deferential," in recognition of the role that the trial court's on-the-spot judgment may play in choosing among alternatives. *Johnson v. United States*, 398 A.2d 354, 362 (D.C.1979). Thus, on appeal this court "does not render its own decision of what judgment is most wise under the circumstances presented." *Id.* "Rather, it examines the record and the trial court's determination for those indicia of rationality and fairness that will assure it that the trial court's action was proper." *Id.*

■ We must consider, first, whether there is a sufficient factual predicate in the record for the determination that the trial court made. "An informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation." *Id.* at 364. Where the record that the parties make is inadequate to support the determination to be made, "the trial court is often required to undertake a special factual inquiry and seek the answers to particular questions or raise questions about particular concerns prior to rendering a discretionary decision in certain areas." *Id.* at 365. "[I]f the court failed to undertake a required factual inquiry or if it ignored an apparent deficiency in the rec-

ord, reversal is appropriate." *Id.* at 366–67 (citations omitted).

■ Second, we must consider the reasoning by which the trial court reached its determination. We must inquire whether the court's action falls "within the range of permissible alternatives" under the law and given the facts presented. *Id.* at 365. More specifically, in reviewing a decision for abuse of discretion, we must assess whether the trial court "failed to consider a relevant factor [or] relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Id.* (internal quotations and citation omitted). "[I]f the trial court's decision is supported by improper reasons, reasons that are not founded in the record, or reasons which contravene the policies meant to guide the trial court's discretion or the purposes for which the determination was committed to the trial court's discretion, reversal likely is called for." *Id.* at 367 (citation omitted).

With these criteria in mind, we evaluate whether the probate court abused its discretion in appointing Mr. Jordan to serve as guardian and custodian for Ms. Orshansky. Although Ms. Pollack attacks the court's decision on a number of different grounds, we do not think it necessary to address all of them. Certain critical errors necessitate that we reverse and remand for further proceedings.

## 2. Disregard of Mollie Orshansky's Own Plans and Wishes

### a. Relevant Statutory Provisions

A principal theme of the Guardianship Act is that the wishes of the subject of an intervention proceeding regarding the decisions to be made are entitled to consideration and respect—notwithstanding that the subject of the proceeding is incapacitated as defined in D.C.Code § 21–2011(11).[13] To begin with, the Act emphasizes that a finding that an individual is incapacitated "shall not constitute a finding of legal incompetence." D.C.Code § 21–2004. Consistent with this premise, the Act contains several provisions to ensure that the court receives and weighs the views of the incapacitated individual. The petition for the appointment of a guardian and notice of the hearing on the petition must be served on the allegedly incapacitated individual. *See* D.C.Code §§ 21–2041(c), –2042(c); *see also* D.C.Code § 21–2053(a) (incorporating notice requirements for petition for appointment of a conservator or other protective order). Such notice may not be waived. *See* D.C.Code §§ 21–2032, –2042(d). Thereafter, the "individual alleged to be incapacitated shall be present at the hearing unless good cause is shown for the absence." D.C.Code §§ 21–2041(h), –2054(e). "The individual shall be represented by counsel and is entitled to present evidence and to cross-examine witnesses, including any court-appointed examiner or visitor." *Id.* If the subject of the proceeding needs an attorney, the court shall appoint one. *See* D.C.Code § 21–2041(d).

The attorney who represents the subject of a guardianship or protective proceeding is statutorily charged with the "duty . . . to represent *zealously* that individual's legitimate interests." D.C.Code § 21–2033(b) (emphasis added). "At a minimum," the Act states, this duty shall include:

13. " 'Incapacitated individual' means an adult whose ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that he or she lacks the capacity to manage all or some of his or her financial resources or to meet all or some essential requirements for his or her physical health, safety, habilitation, or therapeutic needs without court-ordered assistance or the appointment of a guardian or conservator." D.C.Code § 21–2011(11).

(1) Personal interviews with the subject of the intervention proceeding;

(2) Explaining to the subject of the intervention proceeding, in the language, mode of communication, and terms that the individual is most likely to understand, the nature and possible consequences of the proceeding, the alternatives that are available, and the rights to which the individual is entitled; and

(3) Securing and presenting evidence and testimony and offering arguments to protect the rights of the subject of the guardianship or protective proceeding and further that individual's interests.

*Id.* As an additional tool to be used when appropriate, the Act provides that the court may appoint a guardian ad litem "to assist the subject of an intervention proceeding to determine his or her interests in regard to the guardianship or protective proceeding or to make that determination if the subject of the proceeding is unconscious or otherwise wholly incapable of determining his or her interests in that proceeding even with assistance." D.C.Code § 21–2033(a).[14] Elaborating on this assignment, Super. Ct. Prob. R. 306(d) states that a guardian ad litem shall:

(1) Inquire thoroughly into all the circumstances that a prudent individual in the position of the person for whom the guardian ad litem has been appointed would consider in determining his or her interests in the proceedings; and

(2) Encourage the individual whom the guardian ad litem is serving to participate, to the maximum extent of that individual's ability, in all decisions and to act on his or her own behalf on all matters in which he or she is able.

On the specific issue of whom to appoint as guardian of an incapacitated individual, the Act assigns the highest priority to the incapacitated individual's own stated preference:

Unless lack of qualification or other good cause dictates the contrary, the court shall appoint a guardian in accordance with the incapacitated individual's current stated wishes or his or her most recent nomination in a durable power of attorney.

D.C.Code § 21–2043(b).[15] The Act likewise accords highest priority to the wishes of the incapacitated individual in the appointment of a conservator. *See* D.C.Code § 21–2057(a)(1), (2); *see also* D.C.Code § 21–2083(b) (providing that the court "shall" appoint a guardian or conservator in accordance with the most recent nomination in a durable power of attorney,

---

**14.** The office of guardian ad litem is not to be confused with the office of guardian of an incapacitated individual. *See* D.C.Code § 21–2011(8) (excluding "one who is merely a guardian ad litem" from definition of "guardian").

**15.** The term "durable power of attorney" is defined as follows:

A durable power of attorney is a power of attorney by which a principal designates, in writing, another as his or her attorney in fact and the writing contains the words "This power of attorney shall not be affected by subsequent disability or incapacity of the principal, or lapse of time", or "This power of attorney shall become effective upon the disability or incapacity of the principal", or similar words showing the intent of the principal that the authority conferred shall be exercisable notwithstanding the principal's subsequent disability or incapacity and, unless it states a time of termination, notwithstanding the lapse of time since the execution of the instrument.

D.C.Code § 21–2081. One special type of durable power of attorney, a "durable power of attorney for health care," is defined in D.C.Code § 21–2202(3)(B) to be a document that "[c]reates a power of attorney for health-care decisions, which is effective upon, and only during incapacitation and is unaffected by the subsequent disability or incapacity of the principal...."

"except for good cause or disqualification").

## b. Abuse of Discretion in this Case

■ The foregoing statutory provisions were honored only in the breach at the hearing in this case. We are compelled to conclude that the probate court abused its discretion by not giving the wishes of Mollie Orshansky the consideration to which they were entitled by law before appointing Mr. Jordan as her guardian and conservator. Little if any effort was made even to ascertain Ms. Orshansky's wishes. No guardian ad litem was appointed to assist her. Neither her own counsel nor Mr. Jordan undertook to convey Ms. Orshansky's desires to the court. The entire proceeding was conducted in her absence. And when Ms. Pollack purported to report Ms. Orshansky's views as she had expressed them, those views were disregarded without any finding as to whether Ms. Pollack's reporting was accurate.

### (i) Adequacy of Representation of Ms. Orshansky

Preliminarily, we have grave concern that, as Ms. Pollack charges on appeal, Ms. Orshansky did not receive the "zealous" representation of her legitimate interests to which she was entitled under D.C.Code § 21–2033(b). Unfortunately, Ms. Pollack did not raise this claim in a timely or effective manner in the probate court, though she did allude to the fact that the attorney whom the judge had appointed to represent Ms. Orshansky had not spoken to her. As the issue was not aired in the trial court, the record before us leaves many questions unanswered. In this court, however, Ms. Castro acknowledges that she did not interview Ms. Orshansky, which the statute expressly required her to do. It is highly disturbing—not to say

remarkable—that a court-appointed attorney who had not met or spoken with Ms. Orshansky waived her presence at the hearing, stipulated to her client's incapacity, presented no evidence of her client's wishes and opposed the admission of documents purporting to indicate her client's views (the health care proxy [16] and the signed statement), and vigorously advocated in favor of appointments that her client may have opposed. Ms. Castro's brief for Ms. Orshansky on appeal states that "the only reason" she did not visit Ms. Orshansky "is because she was appointed after Pollack surreptitiously removed Ms. Orshansky from the hospital and from the District, and because Pollack has refused to comply with the Superior Court orders." The brief also asserts that, after the court appointed Mr. Jordan temporary guardian and conservator and directed him to see Ms. Orshansky in New York, "Ms. Castro was entitled to rely on Jordan's reports of Ms. Orshansky's condition and their conversations regarding these proceedings." These justifications are singularly unconvincing. Under the Guardianship Act, Ms. Castro was *not* entitled to rely on Mr. Jordan; her duty, as D.C.Code § 21–2033(b) states, was to conduct an independent investigation and interview her client for herself. Nothing in the record supports the implication in Ms. Castro's brief that Ms. Pollack (or anyone else) prevented Ms. Castro from seeing Ms. Orshansky in New York, just as Mr. Jordan did. Ms. Castro never complained to the probate court that she had been denied access to Ms. Orshansky. Moreover, of course, even if Ms. Castro was prevented from interviewing her client, that does not explain how she nonetheless could undertake to represent her at the hearing as she did.

16. At oral argument before this court, Ms. Castro stated that she did not contest the validity of the health care proxy, which is contrary to the position she took at the hearing below.

The failure of appointed counsel to represent properly an incapacitated individual at an intervention hearing would be reason enough, no doubt, to reverse the decisions reached at the hearing. We are mindful, however, that given the undeveloped state of the record on this point, all the facts are not on the table. Indeed, were it not for the signal importance of adequate representation of the subject of an intervention proceeding, we likely would have followed our usual practice of refusing to address at all an issue raised for the first time on appeal. *See, e.g., Barrera v. Wilson,* 668 A.2d 871, 872 (D.C.1995). Accordingly, and *as we are reversing on other grounds in any event,* we shall refrain from commenting further on Ms. Orshansky's representation. We fully expect that on remand, if the proceeding goes forward, the court will devote appropriate attention to ensure that Ms. Orshansky's right to zealous representation is preserved.

### (ii) Absence of Ms. Orshansky from the Hearing

We turn next to the fact that the probate court accepted Ms. Castro's waiver of Ms. Orshansky's presence at the hearing[17] despite the provisions in the Guardianship Act that expressly required her presence "unless good cause is shown for the absence." D.C.Code §§ 21–2041(h), – 2054(e). No party to the proceeding, not even Ms. Pollack, objected to going forward without Ms. Orshansky. Even on appeal, Ms. Pollack has not raised this as a ground for reversal. Nonetheless, given the concerns we have expressed above concerning the adequacy of Ms. Orshansky's representation in this matter, we cannot ignore this departure from what the law commands for the protection of the fundamental rights of the subject of the petition.

Perhaps good cause existed for going forward with the hearing in Ms. Orshansky's absence, but it was not set forth on the record and we fail to perceive it.

We do not believe that in and of itself the January 28 order of the New York Supreme Court directing that Ms. Orshansky not be removed from New York constituted good cause to proceed in the District of Columbia without her. The parties seeking to go forward in this jurisdiction could have asked the New York court to modify its order so as to allow Ms. Orshansky to be brought back to the District for the hearing here. If anything, the pendency of an intervention proceeding in the jurisdiction in which Ms. Orshansky then was located and in which all her family resided—a proceeding, moreover, in which all interested parties were participating—might weigh against the need to hold any hearing at all in the District of Columbia, or to make any appointments here. Although Ms. Orshansky had lived in the District and had property here, and thus had substantial and arguably greater ties to this jurisdiction, this does not appear to be a situation in which her legitimate interests or those of any other party were being prejudiced by avoidance of judicial review or "forum shopping," or in which deference to the New York court would have amounted to rewarding a party for its wrongdoing. *Cf. In re B.B.R.,* 566 A.2d 1032, 1042 (D.C.1989) (Schwelb, J., concurring) (discussing duty of courts in interstate child custody litigation "to guard against attempts by parties to create jurisdictional facts through wrongful conduct" and thereby prejudice their adversaries). Thus, on remand it would be appropriate for the court to reexamine the desirability of going forward, given the presence in

---

**17.** The court accepted the waiver before it was disclosed that Ms. Castro had not interviewed Ms. Orshansky.

New York of Ms. Orshansky and her family and the pendency of a guardianship and conservatorship proceeding there.

Nor did the evidence of Ms. Orshansky's incapacity demonstrate good cause for her absence from the proceeding. Incapacity for purposes of the Guardianship Act does not equate to inability to participate meaningfully at a hearing. The court made no finding that Ms. Orshansky was incompetent in that sense, nor would the evidence have permitted such a finding. The conclusory examiner's report that accompanied the Hospital's petition was not authored by a psychiatrist or gerontologist and did not address Ms. Orshansky's overall competence. The diagnosis of dementia did not provide enough information to answer the question, and the record contains no other expert evaluation of Ms. Orshansky's mental condition. At best, judging by the testimony of Mr. Jordan and Ms. Pollack, there existed a genuine factual dispute over Ms. Orshansky's competence to weigh in on the issues before the court. Although Mr. Jordan reported that Ms. Orshansky was unable to comprehend what was going on, Ms. Pollack testified that her aunt could and did understand and express herself coherently. Without either Ms. Orshansky's presence or an expert evaluation, it is difficult to see how the issue of Ms. Orshansky's competence fairly could have been resolved.[18]

Similarly, the evidence did not establish that subjecting Ms. Orshansky to a return trip to the District of Columbia to attend the hearing would have been deleterious to her health. The court evidently did not think so, since it directed Mr. Jordan to bring Ms. Orshansky back to the District in its final order. But if Ms. Orshansky's frail health did counsel against requiring her to travel for the hearing here, that would count as another reason for deferring to the proceeding in New York.

We do not reverse simply because the hearing was held without Ms. Orshansky. If that were the only flaw in the proceeding, it conceivably might be cured on remand by a retrospective determination that good cause in fact did exist to excuse Ms. Orshansky's absence. But the flaws in the proceeding ran deeper.

### (iii) Evidence of Ms. Orshansky's Wishes

In Ms. Orshansky's absence, Ms. Pollack undertook to convey what her aunt purportedly wished. *Sub silentio*, however, the court disregarded the relevant testimony entirely. The court's statement that it found Ms. Pollack's testimony "inconsistent and troubling in many respects" that the court then enumerated is not a finding that would permit us to conclude that the court considered, but chose to disbelieve, Ms. Pollack's testimony about Ms. Orshansky's plans and wishes. The court did not discuss the evidence presented by Ms. Pollack that Ms. Orshansky opposed the appointment of Mr. Jordan, did not wish to be returned to Washington, had made plans in advance for the care of her person and the management of her assets in the event of her incapacitation, and wanted those plans to be honored. This was critical evidence that the court was required to consider in making the discretionary determination of whom to appoint as guardian and conservator; indeed, as we have noted, Ms. Orshansky's preference had priority under D.C.Code §§ 21–2043(b) and –2057(a)(1) and (2).

In this regard, we think it important to observe that the health care proxy satisfied on its face the definition in D.C.Code

18. Furthermore, to the extent there was a concern about Ms. Orshansky's competence to determine her own best interests in this contested matter, the proper course would have been to appoint a guardian ad litem for her, pursuant to D.C.Code § 21–2033(a).

§ 21–2081 of a durable power of attorney and the definition in D.C.Code § 21–2202(3) of a durable power of attorney for health care.[19] Moreover, in authorizing Ms. Pollack to make "any and all health care decisions" for Ms. Orshansky if she became incapacitated, the proxy granted Ms. Pollack one of the core powers that a general guardian of an incapacitated individual may exercise. *See* D.C.Code § 21–2047(a)(3), (b)(4) and (c)(1)-(4). The health care proxy, if valid (as Ms. Castro concedes it was), therefore triggered the requirement set forth in D.C.Code § 21–2043(b) that unless "good cause dictates the contrary, the court shall appoint a guardian in accordance with the incapacitated individual's ... most recent nomination in a durable power of attorney." To comply with this requirement, the court first needs to recognize it explicitly, which the court did not do in this case, and only then determine whether good cause dictates the rejection of the incapacitated individual's own choice.[20]

In sum, by making the decision to appoint Mr. Jordan as guardian and conservator without taking into account the contrary plans and wishes of Ms. Orshansky, the probate court disregarded the policy and requirements of the Guardianship Act and failed to give proper weight to a factor that she was required to consider. This was an abuse of discretion that necessitates reversal.

We are constrained to say more, for otherwise it might be thought that in determining that Ms. Orshansky's best interests called for returning her to the District of Columbia under the protection of Mr. Jordan, the court found that sufficient grounds existed to justify overriding Ms. Orshansky's apparently contrary arrangements and desires. As we now proceed to discuss, however, the court's determination of Ms. Orshansky's best interests lacked an adequate factual foundation.

### 3. Lack of a Factual Basis for the Determination of Mollie Orshansky's Needs and Best Interests

#### a. Relevant Statutory Provisions

In authorizing a court to empower a guardian and conservator to assume responsibility for the person and affairs of an incapacitated individual, the Guardianship Act establishes an elevated benchmark of informed and careful decision making that is commensurate with the gravity of the

---

19. *See* note 15, *supra*. A durable power of attorney must contain "words showing the intent of the principal that the authority conferred shall be exercisable notwithstanding the principal's subsequent disability or incapacity and, unless it states a time of termination, notwithstanding the lapse of time since the execution of the instrument." D.C.Code § 21–2081. A durable power of attorney for health care must be "effective upon, and only during incapacitation and is unaffected by the subsequent disability or incapacity of the principal...." D.C.Code § 21–2202. The health care proxy signed by Ms. Orshansky stated that it would take effect "when and if I become unable to make my own health care decisions," and would "remain in effect indefinitely." We are satisfied that this language meets the statutory requirements.

20. When the court appointed Mr. Jordan to serve as temporary guardian and conservator, it "voided" all powers of attorney, including the health care proxy, apparently in order to prevent interference with Mr. Jordan's performance of his duties. No other reason appears in the record to justify the court's action in this respect. There was no evidence establishing that Ms. Orshansky was incompetent to execute the proxy, that it was procured through fraud, duress or other improper means, or that Ms. Orshansky revoked it. Assuming *arguendo* that the court had authority to enter the order it did, which we do not decide, our vacatur of Mr. Jordan's appointments means that the ancillary order voiding the health care proxy and other powers of attorney also must be vacated.

decision. To appoint a guardian, the court must be "satisfied that the individual for whom a guardian is sought is incapacitated and that the appointment is necessary as a means of providing continuing care and supervision of the person of the incapacitated individual." D.C.Code § 21–2044(b). The Act enjoins the court to exercise its authority "so as to encourage the development of maximum self-reliance and independence of the incapacitated individual and make appointive and other orders only to the extent necessitated by the incapacitated individual's mental and adaptive limitations or other conditions warranting the procedure." D.C.Code § 21–2044(a). To appoint a conservator for an incapacitated individual, the court must determine that the individual "has property that will be wasted or dissipated unless property management is provided," or that "[m]oney is needed for the support, care, and welfare of the individual or those entitled to the individual's support and protection is necessary or desirable to obtain and provide money." D.C.Code § 21–2051(b)(1), (2).

To guide the court's choice of person to serve as guardian or conservator, the Act lists appropriate candidates in order of priority. *See* D.C.Code §§ 21–2043, –2057. As has been mentioned, the highest priority is accorded to the nominee of the incapacitated individual to be protected.[21] The following persons (or their nominees) then are entitled to consideration in descending order of priority: the incapacitated individual's spouse, adult child, parent, any other relative with whom the incapacitated individual has resided for more than six months prior to the filing of the petition, and finally any other person. *See* D.C.Code §§ 21–2043(c), –2057(a). "With respect to persons having equal priority,

the court shall select the person it deems best qualified to serve." D.C.Code §§ 21–2043(d), –2057(b). The priorities are not absolute. "The court, acting in the best interest of the incapacitated [or protected] individual, may pass over a person having priority and appoint a person having a lower priority or no priority." *Id.*

The standard of proof in proceedings for the appointment of a guardian or conservator is set deliberately high: "the petitioner or moving party shall present clear and convincing evidence that the appointment ... is warranted." D.C.Code § 21–2003. To meet this test, the evidence must be such as to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re D.I.S.*, 494 A.2d 1316, 1326 (D.C.1985) (internal quotations and citations omitted).

The Act also has several other provisions intended to ensure that the court has a firm factual foundation for its decisions. The provisions previously discussed concerning the appointment of a guardian ad litem and the duties of counsel who represents the subject of the intervention proceeding contribute to that end. But of particular note-especially in a contested case such as this one-are the provisions authorizing the court to appoint an examiner and a visitor.

An examiner is "an individual qualified by training or experience in the diagnosis, care, or treatment of the causes and conditions giving rise to the alleged incapacity, such as a gerontologist, psychiatrist, or qualified mental retardation professional." D.C.Code § 21–2011(7). A visitor is "a person appointed in a guardianship or protective proceeding who is an officer, employee, or special appointee of the court and who has no personal interest in the

---

**21.** In the case of a conservatorship appointment, equal priority is given to a conservator, guardian of the property or other fiduciary who has been appointed previously by an appropriate court of another jurisdiction in which the protected individual resides. *See* D.C.Code § 21–2057(a)(1).

proceeding." D.C.Code § 21–2011(26). The Act spells out in detail some of the duties that a visitor shall perform in order to advise the court:

Visitors appointed by the court in guardianship or protective proceedings shall interview the subject of the proceeding, the person who has filed the petition initiating the proceeding, and any person nominated to serve as guardian or conservator. The visitor shall also visit the present place of abode of the subject of the proceeding and the place it is proposed that the individual will be detained or reside if the appointment is made. The visitor shall submit a written report to the court. If a person has been nominated for appointment as a guardian or conservator, the visitor shall investigate whether a conflict or potential conflict of interest should preclude the appointment. If no person is nominated, the visitor shall make a nomination in his or her report to the court.

D.C.Code § 21–2033(c).

The Act provides for the court to appoint both an examiner and one or more visitors to gather information and evaluate the subject of a petition:

(d) After the filing of a petition .... [t]he court shall appoint an appropriate-

ly qualified examiner who shall submit a report in writing to the court.[22] The individual alleged to be incapacitated also shall be interviewed by a visitor appointed by the court. The examiner and the visitor shall be separate persons. The court may waive the appointment of a visitor and, where a report has been submitted in writing to the court for the allegedly incapacitated individual, the court may waive the appointment of an examiner.

(e) The court may utilize the services of additional visitors to evaluate the condition of the allegedly incapacitated individual and to make appropriate recommendations to the court.

D.C.Code § 21–2041; *see also* D.C.Code § 21–2054(a), (b).

■■■■ The examiner and the visitor offer the court valuable assistance in fulfilling the court's mission to make informed decisions about the need for a guardian and conservator and, if need exists, whom to appoint. Although the Act provides that the court may waive the appointment of an examiner and a visitor, the statutory preference—evinced in the repeated use of the word "shall"—is for such appointments to be made in every case unless sound reasons exist to forego them.[23]

---

**22.** Super. Ct. Prob. R. 326(b) states:

(b) *Contents of report.* In the report, the examiner shall make findings indicating whether the individual's ability to receive and evaluate information is impaired to such an extent that he or she lacks the capacity:

(1) To take those actions necessary to obtain, administer, and dispose of real and personal property, intangible property, business property, benefits, and income.

(2) To take those actions necessary to provide health care, food, shelter, clothing, personal hygiene and other care for him or herself so that serious physical illness is more likely than not to occur.

(3) To meet all or some essential requirements for his or her habilitation or therapeutic needs.

**23.** The Guardianship Act provides for the court to approve compensation for examiners, visitors, attorneys, conservators, guardians, and guardians ad litem. This compensation is to be paid from the estate of the ward or person being protected "or, if the estate of the ward or person will be depleted by payouts made under this subsection," from a fund established by the District known as the "Guardianship Fund." D.C.Code § 21–2060(a), (b). In deciding on the necessity for, and the scope of, any appointments, it is proper for the probate court to consider the economic impact on the estate of the subject of the petition. *Cf. Mayes v. Sanford,* 641 A.2d 855, 856 (D.C.1994) (holding that probate court did not abuse its discretion in taking cost into account when it declined to replace feuding family members with non-

### b. Abuse of Discretion in this Case

■ On the record before us, we are compelled to conclude that the probate court did not make an informed decision in this case, either in selecting Mr. Jordan rather than Ms. Pollack to serve as Ms. Orshansky's guardian, or in ordering that she be returned to the District of Columbia for care, or in concluding that a conservator is required to protect Ms. Orshansky's assets and provide money for her support. Those decisions lacked a sound factual foundation largely because the court did not appoint either an examiner [24] or a visitor [25] to evaluate Ms. Orshansky's condition and needs and to make appropriate recommendations, and the parties themselves (each of whom must share in the blame) made little if any effort to furnish the necessary information through expert testimony and witnesses with personal knowledge of the material facts.[26]

### (i) Appointment of Guardian

We appreciate that the court had legitimate concerns about Ms. Orshansky's welfare and whether her relatives could be relied upon to meet her needs. The inability of the family to foresee Ms. Orshansky's deterioration in November and December of 2001 and take more aggressive steps to aid her before her hospitalization

---

family conservator "who would have to be paid" from a "modest estate" that was "already burdened" with medical expenses). The cost of a visitor and an examiner—small in comparison to both Ms. Orshansky's estate and the probable charges of Mr. Jordan and Ms. Castro—would not have been a sound reason to dispense with their appointments in this case.

24. While the Act provides that the court may waive the appointment of an examiner where a written report concerning the allegedly incapacitated individual has been submitted in writing, *see* D.C.Code § 21–2041(d), the only report in the record before us is the one signed by Dr. Goodrich which accompanied the Hospital's petition. That report, which apparently was based on a single examination the day after Ms. Orshansky was admitted to the Hospital and written by an internist who had not treated her previously and who is not a gerontologist or psychiatrist, was too cursory to help the court ascertain whether Ms. Orshansky required care beyond what she was receiving from her family in New York, particularly where nearly two months had elapsed since the date of that report.

25. In lieu of a visitor, the court directed Mr. Jordan to evaluate Ms. Orshansky after it appointed him to serve as her temporary guardian. This was not a suitable substitution, if only because a visitor is required to be someone "who has no personal interest in the proceeding." D.C.Code § 21–2011(26). Beyond that, it may be questioned whether Mr. Jordan, a lawyer selected (apparently at random) from the court's fiduciary list, was well-qualified to serve the court in the role of visitor in this case. The record does not speak to the matter of his qualifications, and we express no opinion about them, but the role of visitor would seem in a case such as this to call for someone such as a social worker with special expertise in the area of identifying and meeting the needs of incapacitated persons. The oral report that Mr. Jordan made to the court after he saw Ms. Orshansky in New York was long on conclusions about Ms. Orshansky's needs and the measures taken for her care under Ms. Pollack's aegis, but it was short, we think it fair to say, on reasons to support those conclusions. Mr. Jordan's report was no substitute for an independent, qualified visitor's report.

26. We do not overlook Ms. Pollack's contention in her brief that there was no need for the probate court to appoint any guardian at all for Ms. Orshansky in view of the presumptively valid health care proxy and trust arrangements that Ms. Orshansky had made. Ms. Pollack did not press this contention, at least not with clarity, at the hearing on February 12 and 13. Rather, she conceded Ms. Orshansky's incapacitation and sought to be appointed her aunt's guardian herself. That said, we express no opinion on the merits of Ms. Pollack's broader contention that Ms. Orshansky does not need a guardian. Our decision does not foreclose Ms. Pollack from advancing such a claim on remand if she believes the facts warrant it.

was worrisome, even if it also was understandable in view of Ms. Orshansky's resistance to intervention in her life as well as other circumstances. Moreover, certain subsequent actions, such as Ms. Pollack's surreptitious removal of her aunt from the Hospital and her refusal to supply financial records to APS, were not calculated to inspire confidence, even if those actions were well-motivated. Nonetheless, while these were red flags that called for further inquiry, they were not dispositive. Judge Christian had "no doubt" of the family's love for Ms. Orshansky; Mr. Jordan's unsubstantiated suspicions notwithstanding, the record does not support any other conclusion. As a general rule, "kinship and familial ties are regarded by the courts with particular partiality when they find it necessary to select a guardian ... [and] such will not be disregarded except upon strong grounds, the presumption being that one of the next of kin or other relative by blood or marriage ... is likely to be more solicitous than a stranger would be of the welfare of the incompetent." Peter G. Guthrie, Annotation, *Priority and Preference in Appointment of Conservator or Guardian for an Incompetent*, 65 A.L.R.3d 991, 998 (1975) (citing cases). *See, e.g., Application of Kauffman*, 55 A.D.2d 526, 389 N.Y.S.2d 5 (1976) ("Absent a demonstrable conflict of interest or objection ... it was an improvident exercise of discretion not to accede to the wishes and concerns of those most closely affiliated with the incompetent.") (internal quotations and citations omitted). Any fair decision in this case would have to take into account the benefits that Ms. Orshansky might reap from residing in her own, familiar apartment in close proximity to, and in ongoing contact with, her sister and other relatives—as opposed to the alternative espoused by Mr. Jordan of her taking up residence over two hundred miles away from her family in her Washington apartment or a nursing home.[27]

Thus the critical issue before the court was whether Ms. Orshansky was being cared for properly in New York, or whether she needed the sort of round-the-clock care by medical specialists that Mr. Jordan proposed and Ms. Pollack rejected. Again, we do not dispute that the court identified legitimate concerns about Ms. Orshansky's care, though we think it imperative to add that a suitable guardian has considerable discretion in gauging how best to care for his or her ward, and the Guardianship Act does not call for judicial micromanagement and second-guessing. Moreover, a balanced appraisal of Ms. Pollack's and her family's efforts on Ms. Orshansky's behalf would have to take into account the not insubstantial measures that they took to provide proper care for her, as described by Ms. Pollack in her testimony. But the main point to emphasize is that the level of care that Ms. Orshansky needed was a complex medical issue that lay outside "the realm of common knowledge and everyday experience" and therefore required expert medical testimony for its resolution by the court in this case. *In re M.D.*, 758 A.2d 27, 32 (D.C.2000) (citation omitted) (holding that medical testimony was required to evaluate whether a mother reasonably should have done more than she did to take care of her child's skin condition). Without ex-

---

27. These polar positions do not exhaust the available alternatives. In this regard, it is surprising that no party seems to have considered the possibility of an assisted living facility, in the New York area or elsewhere, that specializes in caring for elderly residents who are afflicted with dementia but who do not need to be in a nursing home. The apparent failure to recognize the existence of such an option perhaps may be attributed to haste and the fact that an independent expert was not consulted during the course of the proceeding.

pert testimony, the record did not furnish a sufficient factual foundation for the court to conclude that Ms. Orshansky needed more intensive care than she was getting in New York, or that Ms. Pollack was not attending properly to her aunt's welfare.

It is true that the court confronted a situation in which the parties before it "fail[ed] to present [the] critical medical information." *In re M.D.*, 758 A.2d at 33. Like the child neglect law that this court discussed in that case, however, the Guardianship Act is remedial legislation under which the probate court acts in a *parens patriae* role to protect the best interests of the incapacitated individual before it. To achieve that paramount objective, the court "ought not to be passive in the face of what it recognizes is a deficient presentation of evidence." *Id.* at 34. By authorizing appointment of an appropriately qualified examiner and visitor, the Act gives the court the tools to obtain the expert testimony it needed to determine Ms. Orshansky's best interests and resolve the conflict before it. The court should have used those tools in this case. Had the court done so, it likely would have avoided the problem of a record devoid of material evidence. Alternatively, the court had "the authority in its capacity as *parens patriae*" to direct the parties to augment the record with expert testimony. *Id.* Given the options available to it, we expect that if this case proceeds after remand, the court will ensure that an adequate record is made for its decision.

### (ii) Appointment of Conservator

The Guardianship Act authorizes the court to appoint a conservator for an incapacitated individual if the petitioner shows by clear and convincing evidence that "[t]he individual has property that will be wasted or dissipated unless property management is provided," or that "[m]oney is needed for the support, care, and welfare of the individual … and protection is necessary or desirable to obtain and provide money." D.C.Code § 21–2051(b). Such evidence was lacking in this case. There was no evidence that Ms. Orshansky's assets were in danger of being wasted or dissipated, or that a conservator was needed to obtain and provide money for her support, care and welfare. There likewise was no showing that a conservator was needed to track down Ms. Orshansky's property, or to exercise her rights for her. On the contrary, the only evidence before the court was that, in accordance with Ms. Orshansky's own wishes, her money and other property were situated in a trust for her sole benefit that Rose Orshansky, her sister and co-trustee, was continuing to administer without any impropriety.

The court concluded that Rose Orshansky had a conflict with her sister because she had funds of her own that remained in the trust and because she also was a residual beneficiary of the trust. Assuming for the sake of argument that the contradictory hearsay testimony of Mr. Jordan and Ms. Pollack adequately supported this conclusion,[28] it did not establish that Ms. Orshansky's assets were in any actual jeopardy sufficient to justify the establishment of a full-fledged conservatorship. Absent any evidence that Ms. Orshansky's trust was not fulfilling its purpose, the court abused its discretion in deciding to appoint a conservator.

---

28. Mr. Jordan understood, solely from his conversation with Ms. Pollack, that some $90,000 in the Merrill Lynch account belonged to Rose Orshansky as proceeds from the sale of jointly owned real estate. Ms. Pollack contradicted Mr. Jordan, however. She professed to understand only that Rose Orshansky had lent her sister money to purchase her New York apartment. In the latter case, it would be incorrect to say that any funds of Rose Orshansky were in the trust account.

That said, we hasten to acknowledge that many relevant questions were left unasked and unanswered at the hearing in this case, and that there may exist grounds—not revealed on the record before us—to appoint a conservator or enter some other suitable protective order to ensure that Ms. Orshansky's not inconsiderable assets and income are properly maintained. For example, this case would be different if the evidence showed that Rose Orshansky lacked the requisite ability to deploy, conserve or invest trust assets; or that the trust instrument (which was not introduced in evidence, though Mr. Jordan had reviewed it) limited the co-trustee's powers or lacked adequate provision for the appointment of a successor trustee (or other desirable provision); or that Mollie Orshansky had significant property outside her trust. In this latter regard, we note that although Ms. Orshansky's monthly pension was being deposited in the trust's Merrill Lynch account, the pension itself is presumably not a trust asset and it is conceivable that Ms. Orshansky's pension rights may require protection. The foregoing observations are merely illustrative. Many reasons may exist for a conservator to be appointed, as reflected in the broad array of powers and duties that a conservator may have. *See* D.C.Code §§ 21–2070, –2071; *see also* D.C.Code § 21–2055. In view of the evidentiary deficiencies in the record, we add only that Super. Ct. Prob. R. 312 provides that the court may authorize the parties in an intervention proceeding to take discovery in accordance with Superior Court Civil Rules 26 through 37. Such discovery may be used to ascertain, among other things, the existence and status of an incapacitated individual's assets and income, as well as trust arrangements and related matters.

## III. CONCLUSION

For the reasons set forth above, we reverse the decision and orders of the probate court, and vacate the appointments of Harry Jordan as guardian and conservator of Mollie Orshansky. We remand for further proceedings in accordance with this opinion, to the extent that the probate court determines that further proceedings are advisable for the protection of Ms. Orshansky, taking into account the pending proceedings in New York.

*So ordered.*