**In re Ann Cooper PENNING; Ugo Gramegna, Appellant,**

**and**

**George J. Hughes, Elizabeth Hughes, and Hughes & Bentzen, PLLC, Appellants.**

**Nos. 05–PR–455, 05–PR–457.**

District of Columbia Court of Appeals.

Argued Jan. 18, 2007.

Decided July 12, 2007.

As Amended Aug. 16, 2007.

George A. Teitelbaum, Washington, DC, for appellant Ugo Gramegna.

George J. Hughes, with whom Elizabeth Hughes, Washington, DC, was on the brief, for appellants George J. Hughes, Elizabeth Hughes, and Hughes & Bentzen, PLLC.

Iris McCollum Green, Washington, DC, for Ann Cooper Penning.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and FERREN, Senior Judge.

GLICKMAN, Associate Judge:

The instant appeals are from an intervention proceeding that culminated in the appointment of Iris McCollum Green to serve as conservator of assets in the District of Columbia belonging to Ann Cooper Penning. Appellant Ugo Gramegna, who is Penning's husband, primarily contends that the court abused its discretion in concluding that he had an "apparent conflict of interest" that precluded him from serving as conservator of his wife's assets himself. Appellants George J. Hughes, Elizabeth Hughes, and Hughes & Bentzen, PLLC (collectively, "Hughes & Bentzen") principally challenge the court's decision to disqualify them from serving as Penning's counsel on conflict of interest grounds. We reverse the court's rulings and remand for further proceedings.

## I.

Ann Cooper Penning is an American citizen who retired from the practice of law in the District of Columbia and moved to Malaga, Spain in the late 1980s. Although Penning made Spain her new domicile, she continues to own property in the District of Columbia.

In January 2002, while visiting the United States, Penning was examined by Dr. Perry Richardson, a neurologist in Washington, D.C., and diagnosed with probable Alzheimer's disease.[1] Six months later, Penning, who had returned to Spain, was hospitalized for a week for acute gastroenteritis and "[d]ementia syndrome with severe cognitive deterioration compatible with Alzheimer's disease."[2] Penning's brother, John Cooper, traveled to Spain to visit her. After seeing her condition, Cooper filed an intervention petition in the Superior Court of the District of Columbia, seeking the appointment of a guardian for his sister and a conservator for her property in the District. Cooper also filed a "petition for declaration of incompetence" with the Lower Court Number Two of Torrox in Malaga, Spain. The petition asked the Spanish court to declare Penning "totally disabled" and to appoint a "tutor" on her behalf.[3]

In January 2003, while the petitions were pending, Penning married her long-

---

1. Dr. Richardson's January 2002 report states that Penning came to see him by herself to be evaluated for memory loss, and that she had "some insight into her difficulty" at that time. Penning "report[ed] about a five-year history of forgetfulness manifested as failing to recall why she enters a room and word finding difficulty," but "no difficulty with disorientation, food preparation, or other activities of daily living...." An MRI scan revealed "moderate brain atrophy," and Dr. Richardson concluded that Penning "clearly has a prominent cortical dementia which looks quite consistent with probable Alzheimer's disease." Dr. Richardson prescribed the medication Aricept and recommended that Penning keep in contact with her primary physician, who then could "check up on her periodically."

2. The translated hospital report states that Penning displayed memory loss ("forgetfulness of simplest things") and "conduct and behavioral disorders that require[d] regular sedation." Home assistance and continued treatment with Aricept were recommended upon discharge.

3. On appeal, the parties treat a "tutor" under Spanish law as the legal equivalent of a guardian and conservator. We address the issues presented on that assumption, though we take note that the record is silent as to the precise meaning of a "tutor" under Spanish law.

time friend, appellant Ugo Gramegna.[4] Around that time, Penning reportedly asked appellant Hughes & Bentzen, PLLC, a District of Columbia law firm that was assisting her in various matters, to represent her in the intervention proceedings in Superior Court. Appellants George J. Hughes and Elizabeth Hughes, attorneys in that law firm, thereupon moved to dismiss Cooper's petition. The motion was supported by Penning's affidavit, in which she described her background and current circumstances, denied that she was incapacitated or in need of a guardian or conservator, and, in conclusion, stated:

> I vehemently oppose my brother, John H. Cooper or any member of his family being appointed as my conservator, guardian, trustee, and/or receiving power of attorney. Should I, in the future, have need of any assistance, my husband Ugo Gramegna, is able and willing to provide such services.[5]

With the assistance of Hughes & Bentzen, Penning also executed a durable power of attorney designating Ugo Gramegna as her primary attorney-in-fact and Hughes & Bentzen lawyers as secondary attorneys-in-fact.[6] In addition, she executed a deed transferring her property in the District of Columbia to ACPG, LLC, an entity newly created by Hughes & Bentzen specifically to hold her assets.[7] Appellants have represented that Penning owns all of the membership units in the limited liability entity.

Thereafter, on July 10, 2003, the lower court in Malaga, Spain, issued its decision on the petition to declare Penning incompetent. Finding that Penning had become "totally disabled" as a result of "irreversible and progressive mental deterioration" consistent with Alzheimer's disease, the Spanish court chose to appoint the Andalucian Guardianship Foundation to serve as her tutor. The court refused to appoint Gramegna to be Penning's tutor, even though he was her husband, because it concluded that he had a "conflict of interest." The basis for that conclusion is not entirely clear from the court's opinion, but the court deemed it troubling that Penning's marriage to Gramegna took place after she was diagnosed with Alzheimer's disease, and that she reportedly was confused about how long she had been married to him.

As Cooper's intervention petition in Superior Court was still pending,[8] his counsel informed the court of the Spanish decision, and of the fact that it had been appealed. Upon receiving that information, the court requested the parties to file briefs addressing the significance of the Spanish decision for the proceedings in the District of Columbia. Unfortunately, Cooper's counsel became ill and failed to respond to

---

4. Penning and Gramegna were married in York, England. Although the record is not entirely clear on this point, it appears that Penning and Gramegna had known each other for over ten years.

5. Penning also averred that she had a "hostile and disagreeable" relationship with her brother, and she accused him of trying to gain control over her assets for his own benefit.

6. Penning also made out a living will and an advance directive, which named Gramegna as her primary health care agent and Hughes & Bentzen attorneys as secondary agents.

7. Appellants have characterized the limited liability company as a standard estate planning tool but have not otherwise explained its purposes.

8. The commencement of proceedings in the Superior Court was delayed because the original intervention petition was dismissed for improper service of process—it had been sent to Penning's former address in the District of Columbia instead of her current address in Spain. Cooper then filed an amended petition and effected proper service on Penning.

the court's request. Penning filed a second motion to dismiss the intervention petition, which the Superior Court granted on October 9, 2003.

Cooper then retained new counsel, who moved pursuant to Superior Court Rule of Civil Procedure 60(b) to set aside the order of dismissal. Among other things, the Rule 60(b) motion asserted Cooper's belief that Hughes & Bentzen had been hired by Gramegna, not Penning, and that the firm had transferred Penning's assets to a limited liability company either to enrich Gramegna or to divest the Superior Court of jurisdiction over the intervention petition. After receiving the motion, the court appointed Robert Gazzola, an attorney not affiliated with Hughes & Bentzen or related to any of the parties, to act as Penning's counsel and to investigate Cooper's allegations. The court set the Rule 60(b) motion down for a hearing on January 28, 2004.

Prior to the hearing, Gazzola filed a pleading setting forth his initial determinations and recommendations. Gazzola stated that he had reached Penning by telephone, though his initial call to her had been returned by Gramegna, who invited him to travel to Spain at his wife's expense to see her. Gazzola reported that Penning did not know if she had engaged counsel in the District of Columbia and "was not too sure whether ... she had spoken with [appellant Elizabeth] Hughes." She also told Gazzola that she and Gramegna had been married for eight years. In light of her apparent confusion, Gazzola recommended that the Superior Court continue his appointment as Penning's counsel and enjoin Hughes & Bentzen from taking any

actions with respect to Penning's property in the District.

Appearing at the January 28 hearing, Gazzola reiterated what he had written in his pleading. After talking with Penning by telephone, Gazzola said, he "came away with the distinct feeling that she did not appreciate what was going on, her memory was terrible." However, Gazzola said, Penning "did remember [appellants] Mr. Hughes and Ms. Hughes." Gazzola stated that "I'm not impu[gn]ing in any way their representation" of Penning. In response, Elizabeth Hughes represented to the court that Penning had first contacted her in October 2002 (at that time, for services unrelated to the intervention proceeding), and had executed a retainer agreement. Hughes said that she had spoken with Penning approximately every two weeks, most recently in person at her residence in Spain. "She has repeatedly advised me of her wishes to remain in Spain with her husband," Hughes reported. Hughes denied that Penning was incapacitated.

After listening to counsel, the court scheduled an *ex parte* hearing, pursuant to Rule 305(b)(3) of the Superior Court Rules of the Probate Division (hereinafter, "SCR–PD"), to determine whether Hughes & Bentzen should be disqualified as Penning's counsel. At that proceeding, which was held on February 24, 2004, the court heard argument of counsel but did not take evidence. Citing the terms of Rule 305(b)(3), the court denied a request by Gramegna's counsel to participate in the argument, even though Gramegna's alleged role in directing Penning's affairs was a pivotal point of contention.[9] Cooper's counsel, however, was allowed to par-

9.  Rule 305(b)(3) provides as follows:
    If objection to the notice of appearance of retained counsel is filed, the Court shall as soon as practicable hold an ex parte hearing, attended only by the subject, appointed counsel, retained counsel, the person filing the objection and counsel representing such person, and any guardian *ad litem*, visitor and/or examiner appointed in the case.

ticipate in the proceeding, apparently because Cooper's Rule 60(b) motion was still before the court. Penning herself did not attend the argument.

Gazzola asked the court on February 24 to disqualify Hughes & Bentzen as Penning's counsel because of what he characterized as an "appearance of a conflict of interest." While Gazzola conceded that he was "not alleging any misconduct" by the firm, he asserted an appearance of a conflict based on his assumption that Gramegna had been the intermediary between Penning and her lawyers at Hughes & Bentzen.[10] Citing the decision of the Spanish lower court, the diagnosis of Alzheimer's disease that Penning had received, and the fact that Gramegna, rather than Penning, had returned his telephone call to her, Gazzola claimed that Penning was unable to "function independently without the assistance and/or influence of Ugo Gramegna," and that it was "highly questionable" whether Hughes & Bentzen could "deal directly with Ms. Penning" without Gramegna's involvement.

In opposition to Gazzola's request, George Hughes denied that Gramegna had been Penning's intermediary with his law firm. He stated that Hughes & Bentzen was "not influenced by this gentleman [Gramegna] because we have nothing to do with this gentleman." Hughes represented that Penning, not Gramegna, had retained the firm, that she was not incapacitated at that time, and that she maintained "total control" over ACPG, LLC. In addition to reminding the court about Elizabeth Hughes's meeting with Penning in Spain the previous month, Hughes proffered the affidavits of Penning's personal

physician and her Spanish legal counsel. The physician, Dr. D. Marc Vuillon, averred that he had treated Penning from February 2000 to March 8, 2003, that he last examined her on the latter date, and that in his professional opinion, "she was not incapacitated or incompetent" at that time. The attorney, Mr. Ricardo Guerrero Revuelta, averred that Penning had engaged him in January 2003 to represent her in the Spanish competency proceedings brought by Cooper. Revuelta too vouched for Penning's competency. Based on his conversations with her, Revuelta stated, Penning had retained Hughes & Bentzen and wanted that law firm, not Robert Gazzola, to represent her in the District of Columbia Superior Court proceedings. In addition, according to Revuelta, Penning agreed to have her property in the United States "incorporated in a Company, with her owning here in Spain all its shares as part of her assets," and she did not want the property to be placed under an "order of protection" by the Superior Court. Finally, Revuelta averred, in the event a "curator" were to be appointed by the Superior Court over her objection, she wished the position to be filled by her husband, Gramegna.

After hearing the conflicting arguments, the court reinstated Cooper's intervention petition and removed Hughes & Bentzen as Penning's counsel. Although, the court said, it could not find that Hughes & Bentzen had done anything "wrong, unlawful or unethical," it questioned (without deciding) whether Penning had the capacity to retain the firm or the "sophistication" to ask the firm to transfer her property into a limited liability company.[11] Moreover, it

---

10. Cooper's attorney, on the other hand, questioned Hughes & Bentzen's motives in facilitating the transfer of Penning's property in the District to ACPG, LLC, and argued that

the court should be concerned about the propriety of the law firm's conduct.

11. On the contested issue of whether Penning was incapacitated, the court ultimately opted

concerned the court, "terribly so, that [Hughes & Bentzen] ... seem to have the very same position in these matters as does Mr. Gramegna, whom the Court in Spain found highly suspect." These concerns led the court to perceive that the firm had an "apparent conflict of interest" necessitating its disqualification. In addition, the court decided that it would appoint a temporary conservator and issue a protective order to secure Penning's property in the District of Columbia. Two days later, the court appointed Iris McCollum Green to serve as the temporary conservator.

On March 10, 2004, Gramegna filed with the court a motion to participate in the reinstated intervention proceeding. The court granted the motion "subject to [Gramegna's] filing an affidavit stating that he is using his own funds and not Ms. Penning's in participating in this matter and ... [that] his participation is for the purpose of providing information to the Court and not to represent Ann Cooper Penning." Gramegna agreed to those conditions.

Thereafter, on July 21, 2004, the Provincial Court of Malaga, Spain, reversed the Spanish lower court's decision in Penning's case. While the Spanish appellate court upheld the lower court's finding that Penning was "totally disabled," it held that the court erred in refusing to appoint Gramegna as Penning's tutor. The appellate court found no evidence to "substantiate what conflict of interests are to render [Gramegna] unfit or unsuitable" to serve as tutor; in fact, the court stated, Gramegna is the "only family relation who takes care of her, constantly attending to her needs, looking after her and protecting her," and any allegation that Penning was "not mentally aware on the day of their wedding" was unsupported by the record. Moreover, the court ruled, "there is no evidence, not even circumstantial, to show that the husband has used, administered, diverted for his own use or managed properties, revenues or resources belonging to [Penning], or that his patrimony be [sic] provisional or inferior to that of his wife and that, therefore, his interest is financial." On October 20, 2004, pursuant to the appellate court's order, the Spanish lower court formally appointed Gramegna as Penning's tutor.

After receiving the Spanish appellate court's decision, Gramegna petitioned the District of Columbia Superior Court to remove Green as temporary conservator, arguing that the court should defer to the Spanish court's decision and appoint him as conservator instead. The court scheduled a hearing on January 19, 2005, to discuss the merits of the petition and "the comity this Court should give to the ruling of the Court of Appeals in Spain."

At the January 19 hearing, Gramegna's attorney asked the court to grant comity to the Spanish court because it had reached its conclusion after a full evidentiary hearing. Opposing that request, Gazzola contended that granting comity to the decision appointing Gramegna as tutor would "violate our laws" because there is an "apparent conflict of interest" between Gramegna and Penning. According to Gazzola, Spanish law "doesn't consider an apparent conflict of interest, whereas in the District of Columbia we do." Here, Gazzola continued, "there's an abundance of evidence of an apparent conflict of interest. ... We have an LLC. We have a power of attorney. We have diagnoses of dementia over several years period. ... We have the comments of the Spanish [lower] Court ... [which] heard actual testimony, heard actual evidence." Both Coo-

to await the outcome of the appeal of the Spanish lower court's findings.

per's counsel and the temporary conservator, Green, also urged the court to deny Gramegna's petition.[12]

At the conclusion of the hearing, the court ruled that Green would continue to serve as conservator of Penning's assets in the District of Columbia. Two months later, on March 16, 2005, the court issued a written order which, *inter alia*, appointed Green as Penning's permanent conservator; directed her to dissolve ACPG, LLC; and ordered the transfer of the D.C. property to Penning so that it could be controlled by Green.[13] The court found Penning to be incapacitated pursuant to D.C.Code § 21–2011 (2001), "despite the prior objections of removed counsel [Hughes & Bentzen] and Ugo Gramegna." The court further found

> the conduct and actions of Ugo Gramegna suspicious and indicative of at least an apparent conflict of interest. That suspicion is based on the record herein, and in particular, on the question of whether Ms. Penning had the necessary capacity 1) to enter into a marriage with Mr. Gramegna in January 2003 given her documented medical history, which concern this Court shares in contrast to the position of the Spanish Appellate Court; and 2) to understand and execute documents to create a limited liability company into which her District of Columbia real property was transferred.

As additional support for its determination that Gramegna had an "apparent conflict of interest" with Penning, the court cited the Spanish lower court's refusal to appoint him as her tutor. The court declined to defer to the contrary decision of the Spanish appellate court, reasoning that such deference would be misplaced because Spanish law has a "different threshold for recognizing a conflict of interest than this Court and does not recognize, as this Court does, an apparent conflict of interest as a reason for rejecting a candidate for appointment as guardian."

## II.

Ugo Gramegna's main claim on appeal is that the court abused its discretion by excluding him as a potential conservator of his wife's assets on the basis of an "apparent conflict of interest," and by instead appointing as conservator, against his wife's wishes, Ms. Green.[14] We agree with him.

The District of Columbia Guardianship, Protective Proceedings, and Durable Power of Attorney Act of 1986 (the "Guardianship Act") authorizes the Superior Court to appoint a conservator and

---

12. Cooper's counsel proffered that his client was "in the process of [hiring] lawyers in England to invalidate and annul the marriage [between Gramegna and Penning] because of the fact that she was incapacitated, and therefore, not legally able to enter into a marriage."

13. Although Cooper had sought the appointment of a guardian in addition to a conservator, the court did not address the question of a guardianship. However, the court did not have jurisdiction to appoint a guardian for Penning because she was neither domiciled nor physically present in the District of Columbia. *In re Uwazih*, 822 A.2d 1074, 1077 (D.C.2003); D.C.Code § 21–2021 (2001).

14. Gramegna's other claims do not call for extended discussion. Contrary to his contention, the court was not without jurisdiction over the intervention petition in this case, as Penning owned property in the District of Columbia (even if only indirectly, through her ownership of ACPG, LLC), *see* D.C.Code § 21–2021(2), and she ultimately was properly served. *See* D.C.Code § 21–2031(b) (2001). Moreover, the court had the authority to impose appropriate conditions on Gramegna's participation in the intervention proceedings. *See* D.C.Code §§ 21–2041(i), –2054(f) (2001).

issue other protective orders regarding "the estate and affairs of an individual" if the court determines, *inter alia,* that the individual is "incapacitated"[15] and has property within the jurisdiction of the court "that will be wasted or dissipated unless property management is provided." D.C.Code § 21–2051(b) (2001).[16]  In the selection of a conservator, the Guardianship Act further provides that

> The following are entitled to consideration for appointment in the order listed:
>
> (1) A conservator, guardian of property, or other like fiduciary appointed or recognized by an appropriate court of any other jurisdiction in which the protected individual resides, or a person nominated by the incapacitated individual in a durable power of attorney;
>
> (2) A person or corporation nominated by the protected individual;
>
> (3) The spouse of the protected individual;
>
> (4) An adult child of the protected individual;
>
> (5) A parent of the protected individual;
>
> (6) Any relative of the protected individual who has resided with the protected individual for more than 6 months before the filing of the petition; and
>
> (7) Any other person.

D.C.Code § 21–2057(a) (2001); *see also* D.C.Code § 21–2083(b) (2001) (providing that the court "shall" appoint a guardian or conservator "in accordance with the principal's most recent nomination in a durable power of attorney except for good cause or disqualification").  By virtue of the Spanish appellate court's ruling that he should be appointed to serve as Penning's "tutor," his designation by Penning herself in a durable power of attorney, and his status as Penning's husband, Gramegna was entitled to priority consideration under paragraphs (1) and (3) of § 21–2057(a). He plainly had priority over the temporary conservator appointed by the court, as Iris McCollum Green had no relationship to Penning.

■ A candidate's statutory priority does not necessarily entitle him to be appointed conservator as of right.  "The court, acting in the best interest of the protected individual, may pass over a person having priority and appoint a person having a lower priority or no priority." D.C.Code § 21–2057(b) (2001).  *See In re Orshansky,* 804 A.2d 1077, 1099 (D.C. 2002).  In bypassing Gramegna in this case in spite of his priority, the court relied on its "suspicion" that Gramegna did not have Penning's best interests at heart and therefore had at least an "apparent conflict of interest."  The court based its suspicion of Gramegna's motives on the unresolved "question" as to whether Penning had the mental capacity in early 2003

---

**15.** D.C.Code § 21–2011(11) (2001) provides that an "incapacitated individual means an adult whose ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that he or she lacks the capacity to manage all or some of his or her financial resources or to meet all or some essential requirements for his or her physical health, safety, habilitation, or therapeutic needs without court-ordered assistance or the appointment of a guardian or conservator."

**16.** Gramegna appears to concede on appeal that, at least at the present time, his wife is incapacitated within the meaning of the Guardianship Act, though Hughes & Bentzen continues to challenge that determination by the lower court.  We think that any remaining questions as to the degree of Penning's impairments should be addressed in the proceedings on remand, after it is finally determined whether Gramegna will be appointed conservator and whether Hughes & Bentzen will be reinstated as Penning's counsel.

to marry Gramegna and transfer her District of Columbia property into a limited liability company. The court also cited the Spanish lower court's doubts about Gramegna, but as we have seen, the Spanish appellate court found those doubts to be unsubstantiated.

As we explained in *Orshansky,* "[i]n authorizing a court to empower a guardian and conservator to assume responsibility for the person and affairs of an incapacitated individual, the Guardianship Act establishes an elevated benchmark of informed and careful decision making that is commensurate with the gravity of the decision." 804 A.2d at 1098–99. In our view, the decision in the case at bar did not satisfy that exacting standard. The court's decision to override Penning's expressed wish to be cared for by her husband and Gramegna's statutory priority to serve as conservator was flawed because it was based on unproven accusations and suspicions rather than on actual findings of impropriety or conflict of interest. The court made no such findings.

To be sure, given the allegations and proffers made by Cooper and Gazzola, the court had legitimate concerns about appointing Gramegna as conservator. Moreover, given those concerns, the considerations of "comity" that Gramegna invokes did not require the court to defer blindly to the Spanish courts' decision to accept Gramegna as Penning's "tutor." [17] Nevertheless, because Gramegna and Hughes & Bentzen disputed the charges of impropriety and conflict of interest, the court should have determined whether those charges were in fact true. As we stated in *Orshansky:*

"An informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation." . . . Where the record that the parties make is inadequate to support the determination to be made, "the trial court is often required to undertake a special factual inquiry and seek the answers to particular questions or raise questions about particular concerns prior to rendering a discretionary decision in certain areas." . . . "[I]f the court failed to undertake a required factual inquiry or if it ignored an apparent deficiency in the record, reversal is appropriate."

804 A.2d at 1092–93 (quoting *Johnson v. United States,* 398 A.2d 354 (D.C.1979)).

The court was unable to make the necessary findings in the present case, it appears to us, because it did not take the steps envisioned by the Guardianship Act to develop the facts. Specifically, the court neither appointed an independent examiner or visitor to investigate Penning's condition and circumstances, *see Orshansky,* 804 A.2d at 1099–1100,[18] nor held an

---

17. *See Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895) (" 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."); *Butler v. Butler,* 239 A.2d 616, 618 (D.C.1968) ("Comity . . . does not require recognition of a foreign decree which contra-

venes the public policy of the jurisdiction in which recognition is sought.").

18. An examiner is "an individual qualified by training or experience in the diagnosis, care, or treatment of the causes and conditions giving rise to the alleged incapacity, such as a gerontologist, psychiatrist, or qualified mental retardation professional." D.C.Code § 21–2011(7) (2001). A visitor is "a person appointed in a guardianship or protective proceeding who is an officer, employee, or special appointee of the court and who has no personal interest in the proceeding."

evidentiary hearing to assess the allegations made by Cooper and Gazzola. *See* D.C.Code § 21–2003 (2001) (requiring petitioner to "present clear and convincing evidence" that appointment of a guardian or conservator is warranted); D.C.Code § 21–2054(e) (2001) (entitling the individual alleged to be incapacitated to a hearing at which she may present evidence and cross-examine witnesses). Not having done either of those things, the court lacked the necessary "firm factual foundation," *Orshansky*, 804 A.2d at 1099, to make the findings that could have justified its rulings.

Our opinion in *Orshansky, supra*, is instructive on this point. In that case, Jane Pollack appealed the appointment of Harry Jordan as guardian and conservator for her aunt, Mollie Orshansky. We reversed, in part because the trial court did not give "the wishes of Mollie Orshansky the consideration to which they were entitled by law," 804 A.2d at 1095, and "did not make an informed decision ... in selecting Mr. Jordan rather than Ms. Pollack to serve as Ms. Orshansky's guardian ... or in concluding that a conservator is required to protect Ms. Orshansky's assets and provide money for her support." *Id.* at 1101. "[U]nsubstantiated suspicions" that her niece did not have Orshansky's best interests at heart could not justify overriding either Orshansky's wishes or those of her family members. *Id.* at 1102. Rather, we recognized, "[a]bsent a demonstrable con-

flict of interest or objection ... it [is] an improvident exercise of discretion not to accede to the wishes and concerns of those most closely affiliated with the incompetent." *Id.* at 1102 (quoting *Application of Kauffman*, 55 A.D.2d 526, 389 N.Y.S.2d 5 (1976)).

Much as in *Orshansky*, we are compelled to conclude in the case now before us that the court did not make an adequately informed decision and thus did not exercise its discretion properly in appointing Green as conservator against the wishes of Penning and her husband. On remand, the court must determine whether or not it is in Penning's best interest to appoint Gramegna on the basis of a sound evidentiary foundation—a stronger foundation than mere suspicion based on disputed and unproven allegations of impropriety.

## III.

■ Hughes & Bentzen contends that the court abused its discretion by removing the firm as counsel for Penning on the basis of what the court termed an "apparent conflict of interest."[19] We agree with that contention. "The duty of counsel for the subject of a guardianship or protective proceeding is to represent zealously that individual's legitimate interests." D.C.Code § 21–2033(b)(2001). And under the general rule governing conflicts of interest, "a lawyer shall not represent a client with respect to a matter if ... [t]he

D.C.Code § 21–2011(26) (2001). "The examiner and the visitor offer the court valuable assistance in fulfilling the court's mission to make informed decisions about the need for a guardian and conservator and, if need exists, whom to appoint." *Orshansky*, 804 A.2d at 1100. "[T]he statutory preference ... is for such appointments to be made in every case unless sound reasons exist to forego them." *Id.* The court's directive to Mr. Gazzola as court-appointed counsel to investigate Cooper's allegations "was not a suitable substitu-

tion," *id.* at 1101 n. 25, in terms of either qualifications or independence.

**19.** Although appellants contend otherwise, we are satisfied that the court acted well within its discretion in granting Cooper's Rule 60(b) motion to reinstate his intervention petition. *See also Orshansky*, 804 A.2d at 1103 (noting that under the Guardianship Act, "the probate court acts in a *parens patriae* role to protect the best interests of the incapacitated individual before it").

lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests." D.C. RULE OF PROFESSIONAL CONDUCT 1.7(b)(4). As we read the record, however, the court did not disqualify Hughes & Bentzen based on any finding that the firm *in fact* labored under a conflict of interest (or other disability). The court explicitly disclaimed making any such finding. Rather, the court disqualified Hughes & Bentzen because of its concerns that Penning *might have* lacked capacity to engage the firm or make legal decisions [20] and that Gramegna *might have* exercised undue and malign influence over the firm's representation of Penning.[21] Those were charges, advanced by Cooper or Gazzola and denied by Hughes & Bentzen and Gramegna, that would have merited an evidentiary hearing to determine their validity. Had the charges been proven, we presumably would sustain the court's ruling. But as the truth of neither charge was established, we hold that the court exceeded its authority in nonetheless disqualifying Penning's chosen counsel.

■■■ "Whether to disqualify counsel in a civil case is a decision resting within the sound discretion of the trial court." *Derrickson v. Derrickson*, 541 A.2d 149, 152 (D.C.1988); *O'Neil v. Bergan*, 452 A.2d 337, 344 (D.C.1982). "Like any exercise of discretion, however, a court's ruling either way must rest on 'valid reasons' and a 'specific factual predicate.'" *In re Estate of Tran Van Chuong*, 623 A.2d 1154, 1160 n. 12 (D.C.1993) (en banc) (quoting *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979)). A court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). *See also Allen v. Yates*, 870 A.2d 39, 50 (D.C.2005) (quoting *Koon v. United States*, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)) (a court "by definition abuses its discretion when it makes an error of law").

■■■ SCR–PD Rule 305(b)(4) states that the court may remove counsel retained by the subject of an intervention proceeding if it finds that counsel "has a conflict of interest which will prevent counsel from zealously representing the subject."[22] Thus, more than the mere possibility of a conflict must be demonstrated in

---

**20.** "The typical client-lawyer relationship is based on the assumption that the client, when properly advised and assisted, is capable of making decisions about important matters.... [A] severely incapacitated person may have no power to make legally binding decisions." D.C. RULE OF PROFESSIONAL CONDUCT 1.14, cmt. 1. On the other hand, persons with diminished capacity often do retain the ability to confer with counsel. *See id.*

**21.** It must be borne in mind that a client with diminished capacity permissibly "may wish to have family members, lay advocates, or other persons participate in discussions with the lawyer.... Nevertheless, the lawyer must keep the client's interests foremost and ... must look to the client, and not the family members or others, to make decisions on the

client's behalf." D.C. RULE OF PROFESSIONAL CONDUCT 1.14, cmt. 3.

**22.** In its entirety, Rule 305(b)(4) states as follows:

(4) The Court may strike the appearance of counsel retained by the subject if, after the [ex parte] hearing provided for in this Rule [in subparagraph (3)], the Court finds that retained counsel has a conflict of interest which will prevent counsel from zealously representing the subject or if the Court finds that the entry of appearance of retained counsel would unduly delay trial of the case.

No issue of delay attributable to Hughes & Bentzen was raised in these proceedings.

Rules 305(b)(5) further provides that "[t]he appearance of counsel for the subject appoint-

order to justify counsel's removal. Requiring the court to determine whether a conflict of interest in fact exists (within the meaning of the Rules of Professional Responsibility) is consistent with principles supporting a "client's right to freely choose his counsel." *Derrickson*, 541 A.2d at 152 n. 6 (quoting *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir.1978)). "A fundamental premise of the adversary system is that individuals have the right to retain the attorney of their choice to represent their interests in judicial proceedings.... [I]f an attorney is adequately qualified and has not otherwise acted so as to justify disqualification, the client need not obtain the permission of the court or of his adversary to retain the attorney of his choice." *Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 441, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985) (Brennan, J., concurring). Of course, in addition to negating a party's right to counsel of her choice, disqualification also "may severely affect the monetary interest and the reputation" of the affected attorney. *Derrickson*, 541 A.2d at 152 n. 6. For these reasons, we have said, trial courts should "take a cautious approach in disqualifying counsel." *Id.*

In *Derrickson*, a domestic relations case, Mr. Derrickson moved to disqualify his ex-wife's attorney, contending that his brief consultation with the attorney several years earlier on a substantially related matter had resulted in the formation of an attorney-client relationship (even though, after the consultation, the husband had decided not to retain the attorney). *See* D.C. RULE OF PROFESSIONAL CONDUCT 1.9. Opposing the motion, the attorney asserted that he had not entered into an attorney-client relationship with the husband or received any confidential information from him. The trial court ordered disqualification without first resolving the factual dispute over whether an attorney-client relationship had been formed. "Rather," we observed, "the trial court simply expresse[d] its concern that the circumstances require[d] adherence to the canons applicable to the attorney-client relationship; thus the finding [was] akin to one that states that disqualification is required to avoid the appearance of impropriety." 541 A.2d at 153. This, we held, was an insufficient basis on which to disqualify counsel, for "the existence of the [attorney-client] relationship [was] a question of fact" that needed to be proved. *Id.*

As in *Derrickson*, so too in this case the court's legitimate concern that a party's putative counsel of choice *might* have had a conflict of interest warranted further inquiry, but it was not enough to justify an order removing counsel. Without factual findings that Hughes & Bentzen has a "conflict of interest which will prevent counsel from zealously representing the subject," SCR–PD 305(b)(4), or some other genuine disability, the order disqualifying the firm from representing Penning cannot stand.

## IV.

For the reasons set forth above, we vacate the decisions of the probate court appointing Iris McCollum Green to serve as permanent conservator of Penning's assets in the District of Columbia and removing Hughes & Bentzen as counsel for Penning, and we remand for further proceedings in accordance with this opinion.

*So ordered.*

---

ed by the Court shall terminate when the notice of appearance of retained counsel be-

comes effective."