*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 19-PR-0634, 20-PR-0329, 20-PR-0385,
20-PR-0511 & 21-PR-0552

IN RE PEARL ROBINSON;

BRUCE E. GARDNER, APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2014-INT-000358)

(Hon. Gerald I. Fisher & Hon. Jonathan H. Pittman, Trial Judges)

(Submitted April 26, 2023                    Decided October 19, 2023)

*Bruce E. Gardner*, pro se.

Before BECKWITH and DEAHL, *Associate Judges*, and GLICKMAN, *Senior Judge*.

DEAHL, *Associate Judge*: Bruce Gardner, a court-appointed guardian and conservator, asked the probate court to approve compensation for work he performed on behalf of his ward, Pearl Robinson, who died during the pendency of this appeal. This consolidated appeal concerns five different fee petitions spanning different periods of time: three for guardianship services and two for conservatorship services. In four of those, the probate court reduced or denied some of Gardner's fees. In the

fifth, the court rejected his petition in its entirety after Gardner disobeyed a court order and continued billing practices that the court had disallowed in a prior decision. We affirm except in one very discrete respect, detailed below, on which we remand.

**I.**

This appeal is the latest in a string of fee disputes concerning Gardner's guardianship and conservatorship of Robinson. We provided some background in previous appeals from the same underlying proceedings. *See In re Pearl Robinson*, 216 A.3d 887 (D.C. 2019) (*Robinson I*); *In re Pearl Robinson*, 280 A.3d 194 (D.C. 2022) (*Robinson II*). We summarize the pertinent details here before addressing Gardner's arguments.

Gardner was appointed Robinson's guardian and conservator in 2014 after briefly serving as her court-appointed counsel.[1] *Robinson II*, 280 A.3d at 196. At the time, Robinson was an 85-year-old widow who lived with and cared for her adult daughter, Karen. The D.C. Office of Adult Protective Services filed separate

---

[1] We have acknowledged "grave concerns" about the circumstances surrounding Gardner's appointment as guardian/conservator. *Robinson II*, 280 A.3d at 196. While serving as Robinson's court-appointed attorney, Gardner failed to disclose to the court an alleged contract he made with Robinson in which she supposedly promised to pay him $300 an hour if he were to take on guardianship and conservatorship duties. *Id.* Robinson initially opposed his appointment as guardian/conservator but withdrew her objection; she was deemed incapacitated around the same time. *Id.* We held that the guardianship statute governed over any purported side agreement. *Id.*

petitions to appoint guardians and conservators for both the mother and daughter. A court-appointed examiner who interviewed Robinson found that she was unable to take care of her own basic necessities such as food, clothing, and personal hygiene. The court approved the petitions, noting Robinson's memory and health problems (including her bedridden state) as well as her inability to manage her finances, maintain the upkeep of her home, or look after her daughter, who previously relied on Robinson for care. *See* D.C. Code § 21-2011(11). Gardner served as Robinson's guardian and conservator from 2014 until her death in 2022.

### A. *Robinson I* and revised order on remand[2]

Gardner's fee petitions in this matter have been through the judicial wringer both at the trial court and before this court. *Robinson I* concerned a guardianship petition that Gardner filed for the period of November 2015 to November 2016.[3] He had sought $56,832.50 in compensation for 187.7 hours of work at $300 an hour and 20.9 hours of work at $25 an hour. *Robinson I*, 216 A.3d at 889. Judge Richard Levie approved $21,943—less than half of what Gardner requested—because many

---

[2] This section concerns case numbers 20-PR-0329 and 20-PR-0385, which both relate to the amended "second guardianship petition" and the trial court's revised order on remand following our instructions in *Robinson I*.

[3] *Robinson II*, which the court recently decided, concerned Gardner's "third conservatorship petition" (covering the period of November 2016 to November 2017), among other issues. That fee petition is not relevant to this appeal.

of Gardner's billed activities, such as driving Robinson to appointments and writing checks, did not require any special expertise to justify the $300 hourly rate. *Id.* The court approved the $300 rate for legal services but determined that other services for which Gardner could have hired lower-cost aides would be compensated at $90 per hour. *Id.* Judge Levie selected the $90 hourly rate because it "more appropriately reflect[ed] the value of [Gardner's] services," and because that is the rate at which guardians are paid using public funds when a ward's estate is depleted. *Id.* at 891; *see also* D.C. Code § 21-2060.

Gardner appealed, and we concluded that "further explanation [was] required" on why the court picked those rates. *Robinson I*, 216 A.3d at 891. Our case remand was a generic one, vacating "the trial court's order and remand[ing] for further proceedings" in light of what we described as inadequate explanation supporting the trial court's assigned rates. *Id* at 892.

Judge Jonathan Pittman, assigned the case on remand, held that $90 was not, in fact, a reasonable rate, but too high a rate for the services Gardner provided. Judge Pittman further reduced Gardner's compensation from $21,943 to $15,765. The hours that were previously compensated at the $90 rate were divided into "core" guardianship services, which the court compensated at the $300 rate, and "non-core" services, such as caregiving, which the court downgraded to a $25 hourly rate. In the "core" $300 category, in addition to the legal tasks counted in the initial order,

the court included "time spent meeting with Ms. Robinson to learn or discuss her condition or needs" and "time talking with healthcare providers about Ms. Robinson's medical needs and consenting to medical treatment and procedures." For the periods during which Gardner discussed these subjects with Robinson while he drove her to appointments, the court compensated his travel time at half the regular hourly billing rate, or $150.

The court based the lower caregiver rate on the fact that "a home care aide could readily have been hired at $25.00 per hour to perform the caretaking tasks that Mr. Gardner took it upon himself to perform at $300.00 per hour." Tasks in this category included addressing pest issues in Robinson's home, shopping for food, and taking care of other personal needs. The court arrived at $25 because that was the rate that Gardner had previously come up with for some of his shopping activities and because the average wage for home health care aides in the District at the time was around $14 per hour (and Robinson's health care aides were themselves paid between $15 and $25 per hour). The court viewed this rate as reasonable because Gardner could have outsourced those chores to a competent housekeeper.

In reducing Gardner's rate from $300 to $25, the court noted that his billing practices were "antithetical to his fiduciary obligations" to Robinson and were "contributing to the depletion of her estate." Gardner had sought a total of $478,946.06—more than half of Robinson's liquid assets—in the first five years of

his appointment as guardian/conservator. The estate was rapidly shrinking, not just due to Gardner's billing (various judges had reduced or denied Gardner's invoiced fees) but also due to the cost of home health care aides, medical treatment, and other services. Her liquid assets had gone from $864,759.63 when Gardner was first appointed to $156,944.12 some three years later. Her assets were expected to be depleted within a year if spending continued at the same rate, meaning there would be no funds left to pay for her private home health care aides. When the court asked what Gardner planned to do about the estate's imminent depletion, Gardner had no answer.

As we elaborate on below, Gardner argues that the trial court exceeded the scope of this court's remand order in *Robinson I* by reducing his rate from $90 to $25 for some of his services. He also attacks this order (and others described below) on the grounds that the court arbitrarily decided the rates for caregiving and travel time and that all of his billed services fell within the guardianship statute's ambit and therefore should have been compensated at his $300 rate.

## B. Other fee petitions

In addition to the second guardianship petition, at issue in *Robinson I*, Gardner also challenges the trial court's reductions and denials of fees in: (1) the third guardianship petition (November 2016 to November 2017); (2) the fourth guardianship and conservatorship petitions (both November 2017 to November

2018); and (3) the sixth conservatorship petition (November 2019 to November 2020).

*1. The Third Guardianship Petition*

In ruling on the third guardianship petition, Judge Gerald Fisher incorporated the reasoning of Judge Levie's decision on the second guardianship petition. Judge Fisher issued his order and denied Gardner's motion for reconsideration before we issued *Robinson I*, in which we vacated in part and remanded Judge Levie's decision.

The third guardianship petition featured the same billing practices as others Gardner had filed in this and other cases, which had drawn rebukes from various judges. As one illustration of his typical practice, Gardner sought to charge Robinson $420 for picking up her prescriptions at a CVS on one particular day (a nearly 1.5 hour trip billed at the $300 rate), reminiscent of his $540 charge for picking up adult diapers for one of his wards in another case. *See In re Goodwin*, 275 A.3d 283, 285 (D.C. 2022). The court denied just over half of Gardner's total requested fees. In line with Judge Levie's reasoning, Judge Fisher reduced the rate of compensation to $90 per hour for services that could have been handled by a caregiver, secretary, or paralegal, and he assigned a $25 hourly rate of compensation for tasks that "require no specialized skills whatsoever," such as shopping. The court approved the $300 rate only for services requiring legal or fiduciary skills. Gardner filed a motion for reconsideration, which was denied.

## 2. The Fourth Petitions

In the fourth fee petitions, Gardner sought $79,930.44 for his guardianship services and $41,354.54 for his conservatorship services, totaling $121,284.98 for one year. As with his order on remand in *Robinson I*, Judge Pittman found $300 too high a rate for the administrative and caretaking services that Gardner had billed for in his fourth guardianship and conservatorship petitions. The court again approved only $25 per hour for tasks that could have been performed by a caretaker at a lower rate. The court rejected some of Gardner's billed time altogether, including "almost $16,000" invoiced "simply for writing checks to pay [Robinson's] bills and preparing related documents," which Gardner spread out over the course of about 500 entries for 0.1 hours of time—six minutes per check written—billed at $300 per hour. Gardner received no compensation for reviewing Robinson's blood pressure readings, a task he had billed nearly $4,000 for. He also received no compensation for recording his own time, for which he had billed about $3,500. The court also disallowed charges for some, but not all, of the time that Gardner spent preparing motions for reconsideration and appellate briefs concerning his denied fees.

## 3. The Sixth Conservatorship Petition

Following his decision on the fourth petitions, Judge Pittman issued an order finding that Robinson's estate was depleted within the meaning of D.C. Code § 21-2060. That order denied another set of fee petitions (not relevant here) without

prejudice so that Gardner could file renewed petitions seeking fees from the public guardianship fund. But the court also instructed that "any renewed fee petition shall not include billing entries or requests for fees for any of the category of fees that were disallowed" in the court's decision concerning the fourth petitions (writing checks, reviewing blood pressure, and so forth). The court warned that "any amended fee petition that does not comply with the foregoing is subject to summary denial." Gardner nonetheless filed his sixth conservatorship petition, which continued to bill for the same activities that the court had disallowed. Gardner provided additional arguments for why he should be compensated, but did not seek leave to defy the court's order. Because Gardner refused to comply with the court's order, his petition was denied in its entirety.

## II.

Court-appointed conservators and guardians are entitled to reasonable compensation for their services. They are generally compensated from their ward's funds, with the court's approval, provided the ward has sufficient assets for that. D.C. Code § 21-2060(a). If the ward's estate is depleted, the fiduciary may obtain compensation from the public guardianship fund. *Id.* § 21-2060(b). The guardian must file petitions detailing the services provided, the amount of time spent on each

service, and the applicable rate for their services. Super. Ct. Prob. R. 322(b).[4] In ruling on fee petitions, the trial court considers the nature of the work performed and whether that work was necessary or appropriate. *In re Orshansky*, 952 A.2d 199, 211 (D.C. 2008). In addition to being compensated for their court-appointed work, guardians may sometimes be compensated—at the discretion of the trial court—for work they do to defend their right to compensation. *In re Smith*, 138 A.3d 1181, 1185–86 (D.C. 2016) (holding that "compensation for services . . . in connection with a guardianship" in D.C. Code § 21-2060(a) is broad enough to permit "the Superior Court, in its discretion, to approve compensation for a conservator or guardian's work on an appeal in pursuit of a claim for compensation").

"We review the denial of a compensation request for abuse of discretion and review the underlying legal principles de novo." *Robinson I*, 216 A.3d at 890. "In reviewing a decision for abuse of discretion, we must assess whether the trial court failed to consider a relevant factor or relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *In re Orshansky*, 804 A.2d 1077, 1093 (D.C. 2002) (cleaned up).

---

[4] The Superior Court's Probate Rules were revamped in August 2022. D.C. Super. Ct., Rule Promulgation Order 22-03 at 1 & n.1 (2022), https://www.dccourts. gov/sites/default/files/2022-03/Promulgation-Order-22-03-Amending-Super-Ct-Prob-R.pdf; https://perma.cc/8E8Q-EBLX. We cite to the current version of the rules. While a variety of different rules were in effect at the times relevant to the trial court proceedings, none of the differences are material to our consideration here.

### III.

Gardner argues that the probate court (1) exceeded the scope of this court's remand instructions in *Robinson I*; (2) abused its discretion in precluding compensation for certain administrative tasks, cutting his rates for caretaker and travel-related tasks, and denying one petition in its entirety; and (3) erred in denying compensation for some of his work on fee litigation matters. We address each argument in turn.

### A.

Gardner first argues that the court exceeded the "limited scope" of our remand order in *Robinson I* when it concluded that $90 was too high a rate for some of the non-legal services he provided. We disagree.

Gardner is invoking what we sometimes refer to as the "mandate rule," which is "related to the doctrine of 'law of the case.'" *See Streater v. United States*, 478 A.2d 1055, 1057 n.3 (D.C. 1984) (quotation omitted). The mandate rule provides that a trial court is not free to reconsider issues that have already been resolved by the appellate court in the same case, but the flipside is also true: "[A] trial court 'retains discretion under the mandate rule to reconsider, on remand, issues that were not "expressly or implicitly" decided' by the appellate court." *Robinson v. United States*, 878 A.2d 1273, 1277 n.2 (D.C. 2005) (quoting *United States v. Stanley*, 54 F.3d 103, 107 (2d Cir. 1995)). So when Gardner now argues that the trial court was

not free to revisit the previously determined $90 rate for some of his services and reduce it to $25 per hour, the question becomes whether we decided in *Robinson I* that $90 was a reasonable rate so as to preclude the trial court from revisiting that judgment. We did not.

In *Robinson I*, we noted that the trial court did not adequately explain why it had reduced some of Gardner's billed rates from $300 to $90, but a reader of that opinion will search in vain for any conclusion that the $90 rate itself was reasonable. We said nothing of the sort. And *Robinson I* was not a record remand, where "this court retains jurisdiction over the case, and the trial court may take no action, with respect to the case, other than that specified in the record remand order." *Bell v. United States*, 676 A.2d 37, 41 (D.C. 1996). It was an open-ended case remand. *Robinson I*, 216 A.3d at 889 ("We vacate the trial court's order and *remand the case*.") (emphasis added); *id.* at 892 ("[W]e vacate the trial court's order and remand for further proceedings."). A case remand, unlike a record remand, "allows the trial court to amend the ruling that was reviewed and found wanting on appeal." *Jung v. Jung*, 844 A.2d 1099, 1106 n.7 (D.C. 2004).

For his contrary review, Gardner relies on a single statement from *Robinson I* in which this court said that "the trial court has not yet adequately explained . . . why $90 is a reasonable hourly rate," 216 A.3d at 892, contending that this statement

restricted the trial court to offering an explanation in support of its previously determined rate, rather than permitting revisitation of it. That is wrong. Our previous holding that the trial court failed to explain why $90 was a reasonable hourly rate clearly does not express the view that the rate was, in fact, reasonable (much less the view that it was the only reasonable rate). Plus (1) we remanded the case, rather than the record, and (2) we did so in the fairly typical sweeping manner, "remand[ing] for further proceedings," *id.* at 892; both of these aspects of our prior opinion evince no intention to restrict the trial court to merely offering an explanation in support of its previous determination. The trial court was free to revisit the appropriate rate.

**B.**

Gardner next argues that the trial court abused its discretion in various ways by reducing or denying his claimed fees for non-legal services. We disagree in all but one limited respect regarding the third guardianship petition. The trial court's order pertaining to the third guardianship petition pre-dated our opinions in *Robinson I* and *Robinson II* and, like the orders at issue in those cases, assigned a $90 hourly rate of compensation for "non-legal tasks." The trial court used that rate because attorneys compensated under the guardianship fund receive $90 per hour. *See In re Goodwin*, 275 A.3d at 285. This court previously demanded more reasoning than that, and so we do the same. *See Robinson I*, 216 A.3d at 891-92;

*Robinson II*, 280 A.3d at 197-98. Of course, the trial court is free to decide on remand that $90 is in fact too high an hourly rate for activities in which Gardner "[r]eviewed blood pressure and pulse readings," "[m]et with [r]oofing guy," or "[i]nspected installation of the toilet," similar to the trial court's conclusion after the *Robinson I* remand.

The other orders that Gardner attacks post-dated our opinion in *Robinson I* and adequately responded to our instruction in that case to provide more reasoning supportive of various rates of compensation. The trial court explained at length why it was disallowing certain fees in Gardner's remanded second guardianship petition, fourth guardianship petition, and fourth conservatorship petition. We explained in *Robinson I* that it was proper for the court to consider "(1) how granting the request in full would diminish the assets of Ms. Robinson's estate and (2) Mr. Gardner's obligation to conserve those assets." 216 A.3d at 890-91. The court provided further reasoning for why it was compensating guardianship tasks at $300, caretaker and housekeeper tasks at $25, and certain overhead and administrative tasks at $0.

The orders show that all relevant factors were considered and no improper factors were considered. Gardner counters that the trial court failed to consider, among other things, that some of his rejected fees were previously awarded (in this case and others) for the same activities. *See In re Wilson*, 277 A.3d 940, 944-45 (D.C. 2022) (remanding for court to clarify why it awarded certain fees for travel in

one case but not another). We have twice rejected a species of this argument in the two prior appeals in this case. *Robinson II*, 280 A.3d at 197 (a trial court may make "an independent determination as to the reasonableness of the hourly rate claimed in a given compensation application"). While prior awards are certainly relevant—and the orders challenged here all recounted Gardner's history of fee awards in this case—they are not dispositive. The trial court also appropriately considered changed circumstances, including the rapid depletion of Robinson's estate.

In a recent opinion that post-dated the orders at issue here, we explained that blanket denials of compensation for administrative tasks would be "at odds with our 'expansive view of the kind of duties that are compensable under the Act.'" *In re Wilson*, 277 A.3d at 946 (quoting *In re Weaks*, 224 A.3d 1028, 1034 (D.C. 2020)). Gardner was also the appointed guardian in that case. But the administrative tasks that he performed there, for which the trial court denied compensation, were different from those here in both substance and scale. The trial court had disallowed nine entries for "summaries of services he performed" and the time it took him to electronically file two guardianship reports and a fee petition. *Id.* at 945. We explained that the Guardianship Act did not mandate an automatic denial of all such tasks. But we confirmed that "[t]he trial court has discretion, of course, to deny or reduce a fee request it does not deem reasonable, and that includes a fee for time spent on administrative tasks." *Id.* at 947. We also suggested that it would be

appropriate for administrative tasks to be compensated at a rate lower than the fiduciary's standard rate. *Id.* at 946.

Here, the court did not deny compensation for administrative tasks just because they were administrative. Rather, the court considered the fact that his clerical tasks "reflect gross inefficiency, resulting in massive overcharging." The trial court had overwhelming evidence to support its view that Gardner was padding his time, and doing so to an incredible degree: charging one-tenth of an hour, or $30, for every check he wrote, and charging for his driving and waiting time at the bank to deposit checks that could have been deposited electronically. He had billed nearly $16,000 in one year merely for writing checks and preparing related documents. The court did not abuse its discretion in denying compensation for such tasks given the larger context of Gardner's unreasonable billing practices in this case and their deleterious effect on his ward's estate.

Gardner's argument for why he should be compensated at $300 per hour for caretaking tasks, rather than $25, is equally unpersuasive. Gardner offers a smattering of explanations for taking on housekeeping-related tasks, but none is persuasive. He first argues, with no apparent sense of irony, that "three female Ethiopian homecare health aides" could not be trusted with cash to shop for Robinson's food, so he had no choice but to purchase the food himself and to charge $300 per hour to do so. He next claims that he could not utilize food delivery

services because they required a credit card and Robinson did not have one. That supposed hurdle was of Gardner's own making. He could have hired workers who he could trust to do the shopping, and he could have obtained a debit or credit card for Robinson (he was her conservator in charge of her finances). He finally suggests that the Guardianship Act and probate rules precluded him from delegating those tasks, citing to D.C. Code § 21-2047(b)(6), but that provision says no such thing. It is a grant of permission allowing the guardian to delegate "certain responsibilities" to the ward, *id.*, not a constraint precluding the guardian from delegating rudimentary tasks to suitable individuals.

The trial court also noted that Gardner billed nearly five times as many hours as Karen's guardian had billed over the same four-year stretch (between 2014 and 2018), despite the fact that Robinson and her daughter were "similarly situated," "disabled, share[d] the same house, and utilize[d] in-home health care aides." And that does not account for Gardner's conservatorship services; when those are added into the mix, Gardner charged nearly eight times the hours of Karen's guardian, in total.

The court's 50% reduction in Gardner's travel-related tasks was also a proper exercise of discretion. While we previously remanded a case for the court to provide further explanation for its half-time travel rate, *In re Wilson*, 277 A.3d at 943-45, the trial court here gave sufficient reasons in support of reducing Gardner's $300 rate to

$150 for his travel time. The court persuasively analogized to fee-shifting cases in which attorneys are compensated at half their rates for certain travel time. The court authorized this hourly rate even for travel in which Gardner provided no fiduciary services, reasoning that doing so "strikes an appropriate balance between compensating a fiduciary for traveling to appointments . . . and preservation of a ward's assets."

Finally, it was not an abuse of discretion for the trial court to deny Gardner's sixth conservatorship petition entirely, as Gardner violated an express order of the court without seeking leave to do so. Gardner was specifically ordered to "not include billing entries or requests for fees for any of the category of fees that were disallowed." The court admonished that "any amended fee petition that does not comply with the foregoing is subject to summary denial." Without leave of the court, Gardner nonetheless submitted another fee petition containing the same billing entries that the court had disallowed and repeatedly denied on multiple motions for reconsideration.

## C.

The trial court did not abuse its discretion in refusing to compensate Gardner for some of his work on motions to reconsider and his various appeals. A trial court may grant compensation to a fiduciary for the time spent protecting their rights to compensation even if the fee-related litigation was of no benefit to the fiduciary's

ward. *In re Smith*, 138 A.3d at 1188. Granting fees incurred in fee litigation is not mandatory, however, and the trial court has discretion to award or deny those additional fees. *Id.* at 1185-86.

The court properly exercised its discretion in denying Gardner's fees for the time he spent on motions for reconsideration that were largely without merit, unsuccessful, and repetitive. As for Gardner's work in a previous appeal, *Robinson I*, the court permitted some fees and disallowed others. Because Gardner prevailed in obtaining a remand order—albeit one that ultimately led to a reduced recovery for Gardner—the court granted all of Gardner's requested fees for preparing his opening merits brief and reply brief. The trial court disallowed other parts, such as 20.1 hours spent preparing an "amended/corrected" brief. Gardner's motion for leave to file the amended brief in that appeal stated that he had corrected "grammatical and typographical errors," "condense[d] the facts," filled in missing page citations in the table of contents, and "clarifie[d] points of law" but did not change substantively his initial brief. The need to correct his own brief was of Gardner's own making, and the court properly exercised its discretion in denying compensation. *See In re Gardner*, 268 A.3d 850, 861 (D.C. 2022) ("[T]he fact that a fiduciary creates work for themselves in connection to obtaining compensation is a basis to deny or discount an award of fees sought for that work.").

**D.**

Finally, we note our serious misgivings about Gardner's practices in this case, as admirably detailed in Judge Pittman's July 23, 2020, order. Over the course of five years, Gardner sought to collect nearly $500,000 of Pearl Robinson's once considerable, and now depleted, assets. He did so through thousands upon thousands of 0.1 hour (or 6 minute) entries submitted to the court for approval at a rate of $300 per hour for everyday tasks requiring no specialization whatsoever. Only once his blizzard of charges is totaled does one see the hundreds of thousands of dollars that Gardner sought for rudimentary and largely automatable tasks such as check writing, delivery services, checking blood pressure readings, and other chores that could have been assigned to a home health aide paid closer to $25 an hour than the $300 Gardner sought to charge. He also billed Robinson for other questionable tasks like an hour of "listening to CNBC" for information on stocks, at a rate of $300. The trial court's conclusion that "Gardner is guilty of rampant overbilling" is substantiated by the record.

To highlight just a few more specifics of Gardner's practices in this case that concerned Judge Pittman: Gardner sought $16,000 from Robinson for writing checks over the course of a single year. He charged Robinson $420 for a single trip to CVS to pick-up her prescriptions. Gardner billed Robinson for five times as many

hours as the guardian for Robinson's daughter Karen over the same period of time, even though Robinson and Karen were—in the trial court's words—"similarly situated" in terms of the care they needed.[5] And after moving Robinson into a nursing home, Gardner petitioned the court to sell her home, valued at $650,000, at least in part to pay his mounting fees. The court denied his petition because Robinson's daughter Karen was a co-owner and joint tenant of that home and retained a right of survivorship in it, a fact that Gardner failed to disclose in his petition to sell the home. While the trial court found that omission "inexplicabl[e]," one possible explanation is that it was a deliberate omission: Gardner wanted to tap into Robinson's home equity and disclosing Karen's ownership interest in the shared home likely would have prevented him from doing that, so he wanted to conceal Karen's interests in the home.

We have previously detailed similar concerns about Gardner's billing practices over the course of several published opinions. *See, e.g.*, *In re Gardner*, 268 A.3d at 853-54 (detailing how Gardner "bill[ed] for travel from a dummy

---

[5] In his motion for reconsideration before the trial court, Gardner argued that his quintupled hours were justified largely by all of the motions and appeals he had filed in order to secure payment. But in fact those legal filings were only a tiny fraction of Gardner's billed hours, and themselves were no doubt occasioned by the fact that Gardner's overbilling required extensive court scrutiny, rather than redounding to Robinson's benefit in any way.

location outside the District" that "was in fact an address for a UPS store," possibly to inflate his travel time); *Robinson II*, 280 A.3d at 196 (noting trial court's "grave concerns about Mr. Gardner's conduct in connection with" his alleged side agreement with Robinson and the court's "'profound[] disturb[ance]' by the ethical questions created by the alleged agreement," which had it been disclosed, would "have made it highly unlikely that Mr. Gardner would have been appointed" as her guardian/conservator). For instance, and similar to the $420 Gardner sought to charge Robinson for a single trip to pick up prescriptions, he sought to charge a different ward $540 for a single trip to pick up diapers. *In re Goodwin*, 275 A.3d at 285 (recounting how Gardner billed that task as a 1.6 hour endeavor at $300 per hour). This continued pattern of behavior raises serious concerns about Gardner's suitability to act as a guardian.

## IV.

For the foregoing reasons, we affirm the trial court's orders as to all but the third guardianship petition and remand for further proceedings. The trial court on remand should provide additional reasons for its award as to that petition, consistent with the reasoning above. It is within the court's discretion to decrease Gardner's compensation if there is a sufficient factual basis for doing so.

*So ordered.*